Jackson P. BERRY, Plaintiff-Appellant,

v.

J. Glenn BAILEY, individually and as Sheriff of Columbia County, Florida, Defendant-Appellee.

No. 81–5316.

United States Court of Appeals, Eleventh Circuit.

March 5, 1984.

**671**

Datz, Jacobson & Lembcke, Charles B. Lembcke, Jacksonville, Fla., for plaintiff-appellant.

William Avera, Gainesville, Fla., for defendant-appellee.

Before TJOFLAT and HILL, Circuit Judges, and SIMPSON, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

The question we must decide in this civil rights case is whether the appellant established a case for the jury on his claim that his employment as a law enforcement officer was terminated because he exercised his first amendment rights to free speech and association. The jury found for the appellant. The trial judge set aside the jury's verdict, concluding that the evidence was insufficient to support it, and entered a judgment notwithstanding the verdict (n.o. v.). We affirm.

## I.

The evidence presented to the jury disclosed the following.[1] In 1972, J. Glenn Bailey, the appellee, was elected Sheriff of Columbia County, Florida. He took office in July 1974, following an election contest. Shortly thereafter, Bailey hired the appellant, Jackson P. Berry, previously a police officer in San Antonio, Texas, as a deputy sheriff[2] and an undercover investigator. Berry performed his job well, but his unwillingness to favor some of the Sheriff's political supporters, most notably Judge Sam Smith, then a member of the Columbia County Circuit Court, led to his downfall and eventually to his discharge on July 31, 1975.

Soon after his arrival in Columbia County, Berry, unbeknownst to Sheriff Bailey, became involved with the Federal Bureau of Investigation and the Florida Department of Criminal Law Enforcement in an undercover operation to expose a dog fight gambling operation in the county. Berry, using a "body bug," tape recorded several conversations with participants in the gambling operation which indicated that Judge Smith, among others, was receiving payoffs to protect them. In time, the gamblers obtained copies of Berry's tape recordings and learned of the investigation. They complained to the Sheriff. The Sheriff, in turn, summoned Berry to his office. He showed Berry a transcript of one of the tapes, and told him that Judge Smith wanted him terminated. The Sheriff told Berry

---

1. In evaluating a judgment n.o.v. we consider all the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion, [the appellant]. If the facts and inferences point so strongly and overwhelmingly in favor of [the appellee] that reasonable [persons] could not arrive at a contrary verdict" we must affirm the district court's decision. *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc). In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981; *see Johnson v. Bryant,* 671 F.2d 1276, 1279 (11th Cir.1982).

2. Under Florida law a sheriff has the authority to hire and fire his deputies at will. See Fla. Stat. §§ 30.07 and 30.53 (1983).

that he would not terminate him, but he admonished Berry to "cool it."

At the same time Berry was participating in this undercover investigation he was performing investigative work, at the Sheriff's direction, for a grand jury that had been convened to look into the activities of the then Mayor of Lake City, James Tyson. Berry eventually learned that some of the members of the grand jury were close political associates of Judge Smith and that Judge Smith was at odds with Mayor Tyson. As the grand jury investigation progressed, Berry became convinced that its purpose was not to inquire into the operation of the Mayor's office, but, instead, to conduct a political hatchet job on Tyson. Berry refused to be party to such a proceeding, and informed Sheriff Bailey that he would do no further work for that particular grand jury.

The event which culminated in Berry's discharge occurred on the evening of June 20, 1975. Berry and two other deputies were checking bars for beverage violations. They received a radio message that a fight was going on at Jake's for Steaks, a local restaurant and lounge, and proceeded to the restaurant. Upon their arrival, they saw two disheveled men in the parking lot who referred to a fight inside. One of the deputies remained in the parking lot; Berry and the other deputy entered the restaurant. As they entered, they encountered a rowdy group of people about to exit. Berry identified himself as a deputy sheriff and asked an older man in the crowd, J.R. Bielling, what was going on. Bielling responded belligerently, with profanity. Berry threatened to arrest him for using profanity in a public place, but Bielling continued. He pointed out, still profanely and in a loud voice, that he was a prominent citizen and that nobody was going to arrest him. Berry arrested him and escorted him to the police car, followed by the crowd. At the police car a fight broke out between the crowd and the three deputies. The deputies were forced to use their flashlight/nightsticks to regain control; they made several arrests. One of those arrested was Judge Smith's daughter.

The deputies took the arrestees to the county jail and booked them. Shortly thereafter, Sheriff Bailey arrived at the jail. After consulting with Berry, who thought the arrestees should be detained, Bailey released them all on their own recognizance. They happened to be members of Bielling's son's wedding party, out on the town following the rehearsal dinner. After their release, the Sheriff asked Berry if he knew "who these people were." Berry stated "it didn't make any difference [who they were] because they started this fight and we arrested them."

Several days later a prominent local businessman who, along with Judge Smith, had supported Bailey for election, directed one of the Sheriff's deputies to tell the Sheriff that the Jake's for Steaks incident was the last straw; the Sheriff had to get rid of Berry. Sheriff Bailey received the message. He also received a visit from Judge Smith, who pointed out that if his daughter were prosecuted as a result of the incident a local teaching job for which she had applied might not be forthcoming.

A few days later, the Sheriff implored Berry to consider dropping the charges against Judge Smith's daughter, and also against the other young women, to avoid any semblance of favoritism. Berry told the Sheriff that he would not drop the charges; he added that he did not consider the Judge's daughter a fit person to teach his children in any event. The Sheriff mulled over the problem for a few days, commenting to other deputies in passing that Berry had gone too far this time. He finally called Berry into his office and asked him for his resignation. Berry sought an explanation. The Sheriff, after attempting to evade the issue, indicated that his political supporters had told him that he would not be reelected if Berry remained on his payroll. Berry refused to resign, so the Sheriff fired him. Thereafter, the Sheriff announced to the press that the charges against the three women arrested at Jake's for Steaks had been dropped.

Two years later, Berry filed this suit under the Civil Rights Act, 42 U.S.C. § 1983 (Supp. V 1981), claiming that his discharge had violated his first amendment rights because he had been fired for "political reasons." He sought compensatory and punitive damages. The case was tried to a jury; it returned a verdict of $10,000 in compensatory damages and $75,000 in punitive damages. The Sheriff moved for judgment n.o.v., and the district judge granted it, concluding that Berry had implicated no first amendment right in presenting his case.

We agree that no first amendment rights were implicated by Berry's discharge. In reaching this conclusion, we do not intimate that Sheriff Bailey's actions in running his office or in firing Berry were laudable or even palatable; we merely conclude that the first amendment provides no basis for a remedy in this case.

## II.

The question we must decide is not, as the parties argue, whether Sheriff Bailey's desire to promote his own "political association" caused the firing; rather, it is whether Berry's exercise of protected speech or association rights caused the firing.

This case possesses none of the characteristics of a traditional freedom of association case. For example, there is nothing in the record to indicate that Berry was fired because he was of a different political party than Bailey. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Nor is there anything in the record to indicate that Berry was fired because he refused to support Bailey or any other person for reelection, i.e., because he did not have sufficient "loyalty for a man, not a political party." *Tanner v. McCall,* 625 F.2d 1183, 1191 (5th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). Finally, nothing in the record indicates that Berry was fired because he did or did not associate with, or financially support, any other person or group.[3] Berry nonetheless insists that he did present an "association" claim; he refused to support, *by his words and actions,* the interests of several influential people in the community. This, however, is characteristic of a speech claim, not an association claim.[4] We therefore analyze the record in light of the relevant case law to determine whether the jury verdict should be reinstated because Berry offered sufficient evidence that he was fired for exercising his right to freedom of speech.[5]

---

**3.** Berry never alleged that the Sheriff's political supporters were annoyed because he refused to associate with them; he merely asserted that they objected because he persisted in doing his job in a manner that hurt their interests.

**4.** Berry argues that he was fired for his beliefs, and that his case is therefore a political patronage case. He contends that *Branti v. Finkel,* a case where an employee was fired because he belonged to a different political party than his employer, supports an argument that one cannot be fired for "beliefs." In context, however, *Branti* referred to the beliefs causing one to join one association, such as a political party, rather than another, such as the opposing party.

*Branti's* reference to beliefs does not require us to analyze this case as a political patronage case. A person cannot be fired for his beliefs if they do not somehow manifest themselves; his employer would not know what the beliefs were. Such beliefs might manifest themselves in the person's speech or in conduct constituting symbolic speech; they might also appear in his political associations or in his religious activities. To determine what line of cases is most analogous to, and therefore instructive on, Berry's claim, we look at the manner in which his "beliefs" became known to the outside world. Here, his beliefs were made known only through speech and accompanying action—not through those with whom he associated politically or refused to associate politically. Our analysis would not change were we to discuss this claim as an association claim as well; *Pickering v. Bd. of Ed.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), cited *infra,* applies to all first amendment claims. *See Tanner, supra.* However, by pinning down the essence of Berry's claim, our discussion becomes simpler.

**5.** Berry also indicates in his brief that Sheriff Bailey made selective enforcement of the law a condition of his employment. Whether or not the Sheriff would be subject to sanctions in a suit brought by Berry or anyone else to stop the Sheriff's selective enforcement of the law,

Berry contended that the constitutionally protected speech for which he was fired was "the full context of the speech and action between Berry and Bailey from the Jake's for Steaks incident until [his] firing." The sum of Berry's relevant speech and action (arguably symbolic speech) in that time frame was the following: (1) his statement to Judge Smith's daughter that she was under arrest; (2) his "disagreement" with the Sheriff's indication to him the night of the Jake's for Steaks incident that he should release all the arrestees (the record does not show if, or how, this disagreement was verbalized); (3) his statement to Bailey on the night of the Jake's for Steaks incident that he did not know who the arrestees were, but that it "didn't make any difference because they started this fight and we arrested them."; (4) his statement to Bailey that he "wasn't sure" he wanted Judge Smith's daughter teaching his children; (5) his statement to Bailey that he would refuse to recommend the dismissal of charges against Judge Smith's daughter. In scrutinizing the record, we find no other words, actions constituting symbolic speech, or other expressions of belief (such as through association or religion) to which Berry has pointed, or could point, to support a first amendment claim. Of these, Berry's statement to the Judge's daughter that she was under arrest should not be considered; the record even under the judgment n.o.v. standard demonstrates no causal relationship between this statement and the firing.

It is axiomatic that the Sheriff could not condition Berry's employment on his relinquishment of his first amendment rights. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 597–98, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972). If Berry were discharged for exercising a protected speech right, that he exercised it in private (e.g., the Sheriff's Office) rather than in public (e.g., a newspaper letter) would not prevent a decision in his favor. *Givhan v. Western Line Consolidated School District,* 439 U.S.

410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). However, we must be able to find some indication in the record that Berry was indeed dismissed for exercising a protected speech right before we can reinstate the jury verdict in his favor. If he were fired for insubordination, even if his way of trying to run the Sheriff's Office were objectively more moral or efficient than the way the Sheriff chose to run his office, he would have no first amendment protection.

In order to succeed on his first amendment claim, Berry was required to pass the United States Supreme Court test described in *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Under that test, Berry had to demonstrate, first, that the speech for which he alleged he was fired was constitutionally protected and was a substantial or motivating factor in the decision to dismiss him. Then, the burden of proof would shift to the Sheriff to show by a preponderance of the evidence that he would have dismissed Berry in the absence of the protected speech. *See Waters v. Chaffin,* 684 F.2d 833, 836–37 (11th Cir.1982). We find that Berry failed to demonstrate that his speech was constitutionally protected, and therefore the judgment n.o.v. was properly granted on that basis.

In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court set forth the relevant considerations for determining whether a public employee, in that case a teacher, had engaged in constitutionally protected speech. The Court stated:

"[t]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest

these arguments are not relevant to Berry's first amendment claim. In this case, we care only about whether Berry's exercise of *his* pro-

tected right to speak freely or to associate freely caused his firing.

of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* at 568, 88 S.Ct. at 1734–35 (citations omitted). *Pickering* considered the "time, place and circumstances" concept in evaluating the government's interest in regulating the speech and the individual's interest in making the speech. *See Abbott v. Thetford,* 529 F.2d 695, 707 (Gewin, J., dissenting) (5th Cir.) *rev'd en banc,* 534 F.2d 1101 (1976) (adopting the dissent of Gewin, J.), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977). The *Pickering* Court, finding that employee's speech protected, noted:

> The statements are in no way directed towards any person with whom Appellant *would normally be in contact in the course of his daily work* as a teacher. Thus no question of maintaining either *discipline by immediate superiors or harmony among coworkers* is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent *are not the kind of close working relationships* for which it can persuasively be claimed that *personal loyalty and confidence* are necessary to their proper functioning.

(emphasis added). 391 U.S. at 569–70, 88 S.Ct. at 1735.

The district judge in Berry's case applied the *Pickering* principle. He stated in his opinion and order granting Bailey judgment n.o.v. that:

Taking all the evidence into consideration, the jury apparently concluded that, despite his denial, the sheriff bowed to the pressure exerted on him by his political supporters and fired plaintiff *when he refused to drop the charge against the former judge's daughter.*

(emphasis added). The judge then decided that Berry's refusal to obey his superior was not a constitutionally protected right, noting that "all of the cases cited by [Berry] ... involve conduct clearly protected by the first amendment." [6] In contrast, the court described Berry's claim as being "that he was fired for doing a good job," and stated: "While the court agrees that termination for such a reason can be unjust," it does not implicate a first amendment right. We agree.

This case is most neatly covered by a footnote to the recent dissenting opinion in *Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In that case, an assistant district attorney, after learning that she was being transferred against her will, distributed a questionnaire to the district attorney's office employees. She was fired for distributing the questionnaire. The majority, applying *Pickering,* found that such speech was not of sufficient public concern to outweigh the government's interest in the harmony of working relationships, which was threatened by the questionnaire. Even the dissenters, who would have precluded the questionnaire-distributor from being fired because her speech, in their view, was protected, drew a

---

**6.** ·*See, e.g., Leonard v. City of Columbus,* 705 F.2d 1299 (11th Cir.1983) (policemen's clipping flags off of their uniforms was constitutionally protected speech); *Waters v. Chaffin,* 684 F.2d 833 (11th Cir.1982) (police officer's obscene and derogatory comments about his superior to another officer off duty constitutionally protected); *Williams v. Board of Regents of University System,* 629 F.2d 993 (5th Cir.1980), *cert. denied, sub nom. Saye v. Williams,* 452 U.S. 926, 101 S.Ct. 3063, 69 L.Ed.2d 428 (1981) (university policeman fired for leaking to press information regarding coverup—letter was constitutionally protected speech); *Bickel v. Burkhart,* 632 F.2d 1251 (5th Cir. Unit A 1980) (fireman's speaking out ·at a public meeting

indicating that his fire station was inadequately maintained and overworked constitutionally protected); *D'Andrea v. Adams,* 626 F.2d 469 (5th Cir.1980) *cert. denied,* 450 U.S. 919, 101 S.Ct. 1365, 67 L.Ed.2d 345 (1981) (plaintiff teacher's communication to legislative subcommittee alleging that officials of the school where he taught had improperly managed funds was constitutionally protected). *Cf. Abbott v. Thetford,* 534 F.2d 1101 (5th Cir.1976) (en banc), (reversing 529 F.2d 695 (1976) and adopting dissent) (judge's probation officer's bringing suit against local legal system without following judge's instruction to ask his permission first not constitutionally protected speech).

line beyond which in-office speech would not be protected:

> Perhaps the simplest example of a statement by a public employee that would not be protected by the First Amendment would be answering "No" to a request that the employee perform a lawful task within the scope of his duties. Although such a refusal is "speech," which implicates First Amendment interests, it is also insubordination, and as such it may serve as the basis for a lawful dismissal.

*Id.* at —— n. 3, 103 S.Ct. at 1698 n. 3 (Brennan, J. dissenting). In this case, for Berry to recommend to the prosecutor that the charges against the women arrestees be dropped would certainly have been lawful in the sense that such a recommendation was within the set of duties that a deputy sheriff, on the sheriff's orders, was permitted by law to perform. Berry flatly refused to follow the Sheriff's wishes in this regard. While corruption in the Sheriff's office is a matter of legitimate public concern, it is not so vital a matter that it would justify our protection of an employee's flagrant defiance of his direct supervisor.

The Court in *Connick* did not indicate whether an express or implied refusal to perform a task requested by one's employer is speech to which no constitutional right attaches, or whether it is speech that, while protected, is per se outweighed by the government's interest. Whatever the category in which one wishes to include Berry's statements, those constituting refusal to perform a duty as a matter of law could not support a finding that Berry was discharged for exercising protected first amendment rights. All of the statements except the statement implying that the Judge's daughter was not fit to teach Berry's children were in direct conflict with the Sheriff. They took place on the job and concerned Berry's performance of his official duties. These statements are the kind that *Pickering* described as implicating the government's interest; they threaten office discipline and harmony in the day-to-day close working relationships with immediate superiors necessary for efficient office functioning. Under the *Pickering* analysis, they are not protected speech.

We must then consider whether the remaining statement regarding the Judge's daughter's teaching qualifications constituted protected speech. That remark did not directly criticize Sheriff Bailey or pertain to Berry's performance of his job. If it was protected, there would have been a jury question under the second prong of the *Mt. Healthy* test, as to whether Bailey would have fired Berry notwithstanding that statement. We find that even if that remark might be constitutionally protected according to the *Pickering* test in other circumstances, in this context it was part of a set of actions posing a threat to the disciplinary structure of Berry's job. Moreover, even when we evaluate his claim under the generous judgment n.o.v. standard, Berry cannot seriously contend on this record that he was fired for one private slighting remark about the Judge's daughter.

We agree with the district court that Berry is trying to claim that he was fired for doing his job expeditiously and honestly. While in this case, Berry's approach to law enforcement might have yielded a more pristine sheriff's department than that of his superior, we cannot encourage employees to defy their employers and refuse to perform their duties every time they think that the employer is running the office improperly. This is not a case where Berry performed his duties according to his superior's wishes, and pursued some outside course of action against the office's inadequate enforcement of the law. Such a fact pattern would have presented a closer case. On these facts, we cannot find any speech that passes the *Pickering* test and is thus constitutionally protected. Without that, Berry has not met his burden under *Mt. Healthy* as a matter of law, and the judgment n.o.v. for Bailey must be, and is

AFFIRMED.