The CUBAN MUSEUM OF ARTS AND CULTURE, INC., Ramon Cernuda, Alfredo Duran, and Santiago Morales, Plaintiffs,

v.

The CITY OF MIAMI, Defendant.

No. 91–0656–CIV.

United States District Court,
S.D. Florida.

May 21, 1991.

Maurice Rosen, North Miami Beach, Fla., for plaintiffs.

Warren Bittner, City of Miami Atty., for defendant.

FINAL ORDER GRANTING
INJUNCTIVE RELIEF

JAMES LAWRENCE KING, Chief Judge.

This cause comes before the court following a hearing on a motion for preliminary injunction. The plaintiffs, the Cuban Museum of Arts and Culture, Inc. ("Cuban Museum" or "Museum") and several of its directors, seek an injunction preventing the City of Miami from evicting the Cuban Museum from the premises that it has leased from the City for over nine years. In addition to the injunctive relief sought, the plaintiffs also seek declaratory relief and damages pursuant to 28 U.S.C. §§ 2201 and 2202 and pursuant to 42 U.S.C. §§ 1983 and 1988.

During the hearing on the motion for preliminary injunction, the court asked whether the parties would be willing to consent to the consolidation of the hearing with the trial on the merits, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, thereby fully disposing of all claims raised in the action. The parties consented to such a consolidation, and by prior order, the hearing on the motion for preliminary injunction was converted into the full trial on the merits.

## I. BACKGROUND

The Cuban Museum of Arts and Culture, Inc. is a non-profit corporation formed under the laws of the State of Florida. In October of 1981, the Cuban Museum entered into an agreement to lease the premises located at 1300 S.W. 12th Avenue from the City of Miami. This building, a former firehouse, was to serve as the home of the Museum. In October of 1982, after substantial sums were spent in preparing the building for its new use, the Cuban Museum was inaugurated. Apparently, the Museum functioned for a number of years without incident or problem. The City of Miami even extended the lease for two additional three-year periods without any apparent concern or reservation. In fact, the last three-year period began shortly before the relationship between the City of Miami and the Cuban Museum became imbued in political controversy.

In the early part of 1988, the events that have embroiled the Cuban Museum in controversy began to take shape. The Cuban Museum was making plans to hold its second art auction at the auditorium of neighboring St. Peter and Paul Catholic School in order to raise funds for the Museum. The Museum's Board of Directors apparently delegated the task of choosing art works to an auction committee. In making its various selections, however, the committee selected a number of works that were created either by artists who had not renounced the Castro regime or by artists who had continued to live in a communist Cuba.

The testimony revealed that similar work by such "controversial" artists had been exhibited and sold in previous years at the Museum. The controversial nature of the artists producing these works was not an issue until the Spring of 1988. At that time, an anonymous package listing the artists to be shown at the auction and alleging communist sympathies was sent to various media organizations. Shortly thereafter, on April 15, 1988, the President of the Cuban Museum called a Board meeting to decide whether the controversial art should be excluded from the auction and preceding exhibition. Although the Museum's Board of Directors was evenly divided (votes were 19 to 18), the decision of the Board at that meeting was that the controversial art works would not be excluded and the April 22nd auction would proceed as scheduled. The auction was indeed held, amidst hostility and threats. One of the controversial paintings was purchased at the auction and burned in the streets outside the Museum as a small crowd chanted its opposition to the inclusion of the controversial artists.

The commotion surrounding the auction and the hostile climate that enveloped the Cuban Museum did not end with the conclusion of the auction. In the aftermath of the auction, at least one exhibition, that of Amelia Pelaez, had to be postponed. Moreover, attempts were made to have certain directors of the Museum resign. Although the attempts were mostly confined to peaceful, albeit adversarial actions within a boardroom and within the press, at least one contemptible person in the South Florida community took unlawful terrorist action. A bomb was exploded underneath the automobile of Teresa Saldise, an attorney serving as a director and vice president of the Cuban Museum. She and plaintiff Ramon Cernuda, as members of the Museum's executive committee, were asked to resign at an emergency meeting held during the first week of May, 1988. When it became apparent that the resignations were not forthcoming, over a dozen of the Museum's directors, those who had strongly opposed any connection with the controversial artists, resigned from the Museum's

board. Those who remained as directors endured McCarthy-like allegations of communist inclinations and sympathies.

On May 12, 1988, the controversy surrounding the Museum was brought to the floor of the Miami City Commission where it was discussed at a regular meeting. Individuals who would later form a group named the Cuban Museum Rescue Committee expressed their dissatisfaction with the actions taken by the Museum's directors in the preceding months and voiced their opposition to the continued management of the Cuban Museum by these directors. In fact, individuals and groups appearing at the Commission meeting sought to oust those directors who had continued running the Museum and supplant them with others who were, allegedly, more in tune with the political goals and spirit of democracy that the local Cuban community espouses. The divisiveness that the controversial exhibition and auction created within the local community was thus squarely thrust before the Miami City Commission.

The Miami City Commission was obviously placed in a difficult political situation. A substantial portion of the local Cuban community, including various prominent local figures, had come out against the Cuban Museum's remaining directors and the actions that they had taken. The City was asked to consider the management of the Museum and find a way to oust the Museum's administration.

These pleas did not fall on deaf ears. The Miami City Commission took action quickly. On May 12, 1988, the Commission passed a resolution directing the city administration to investigate alleged violations of the Cuban Museum's lease agreement, possible violations of the Trade Embargo Act, and the possible placement in jeopardy of the Museum's non-profit status. Certain matters were to be referred to federal and local authorities. In addition, the Commission created a five member "watchdog" committee which was to be present at meetings of the Cuban Museum and which was to oversee the operational aspects of the Museum. Four individuals were originally appointed to that committee, but the committee was dissolved at a later Commission meeting.

In the nearly three year period that followed, the City Commission was frequently confronted with the controversy surrounding the Cuban Museum. The City launched investigations of virtually every allegation that was made concerning the Cuban Museum. The Commission demanded that action be taken quickly: Indepth audits should be conducted promptly, and the reports should be brought before the Commission without delay. Three "unique" audits were thus conducted by the City, audits that were apparently unprecedented in their scope and proximity to one another, even in cases where a tenant's rent was computed from earnings or sales. The three audits in three months, all conducted with the cooperation of the Museum, found that funds obtained and handled by the Museum were properly accounted for and that the Museum was indeed providing public services as contemplated by the lease agreement. Yet, the conflict involving the controversial art remained, and the City, prompted by the Cuban Museum Rescue Committee and other local residents, continued to pursue the Cuban Museum and its directors.

Allegations were made that the Museum had instituted a $2.00 admission charge in contravention of the City's intent that admission be free. Allegations were also made that art works had been sold at the Cuban Museum in December of 1988 and in December of 1989. The Commission ordered that these allegations be investigated. With these allegations, the City Commission apparently decided to rid itself of the Cuban Museum controversy and of those directors whose chosen mode of expression had caused it. The City Commission directed the City Attorney to initiate eviction proceedings in accordance with the results of his investigation and legal research. The City Manager issued a notice of lease termination to the Cuban Museum, stating that the Museum had failed to discontinue the sale of art work on the Museum's premises and had therefore failed to cure violations of the lease.

Formal eviction proceedings were not begun at that time, however. The City Attorney opined that, despite the allegations that had been presented, the actual facts involving the Cuban Museum were such that eviction proceedings would prove unsuccessful. For example, sales of art works for fundraising purposes had been taking place at the Museum since its inception. Testimony revealed that the first such fundraiser was even attended by then-Mayor of Miami Maurice Ferre and other dignitaries who were well aware of the fundraising nature of the event. Moreover, the sale of art works by the Museum in December of 1988 and in December of 1989 merely involved seasonal fundraising in which various artists had sketched small drawings to be placed on a Christmas tree. These drawings were then sold for about $25.00, sales which did not even approximate the scope of the auctions that had so concerned the Commission immediately following the public outcry regarding the controversial art.

Transcripts of City Commission meetings indicate that Commissioners were irritated and frustrated with the problem of how to get rid of the Cuban Museum and the underlying controversy. However, the City Attorney advised the Commission that it could simply allow the lease to expire naturally on its own terms. The Commission indicated its displeasure with this option and the accompanying delay. It nonetheless passed a motion resolving not to renew the lease agreement with the *present administration* of the Cuban Museum. At the same time, the Commission voted to look for an alternative city-owned site for a Cuban museum run by the opponents of the Cuban Museum's current directors. Notably, the Commission wanted to assure that the more popular and less controversial group, which allegedly embodied the true spirit and viewpoint of the Cuban Museum and the Cuban exile community, would have a forum in which to serve the community and express its views on the history, art, and culture of the Cuban people.

Although the City Commission voted on February 7, 1990 not to renew the lease with the present administration of the Cuban Museum, the City passed a resolution accepting the offer of Mr. A.J. Barranco to serve as a mediator and negotiator in the dispute between the Cuban Museum's directors and their opponents. The Commission apparently hoped that resolving the dispute between the rival factions would put an end to the controversy, allow the Cuban Museum to continue at the leased premises, and restore peace and harmony to the community.

On March 28, 1991, the lease agreement between the City and the Cuban Museum was again considered by the City Commission. At that time, various proposals were considered and discussed by the Commission as ways of keeping the Cuban Museum on the leased premises while at the same time putting an end to the public controversy over the Museum. Among the proposals discussed were the resignation of those directors most closely tied to the controversial art, the "popular election" of a new board of directors, and the possible temporary care of the Museum by the City. The proposals proved to be either impractical options or options that were unacceptable to those groups opposing the Cuban Museum and its directors. The City Commission therefore chose to take no further action. The resolution proclaiming that the City would not renew the lease agreement with the present administration of the Cuban Museum remained in effect. Yet, the City Commission's discussions reflected a strong desire to keep the Cuban Museum at its current premises, if only the controversy and the alleged instigators of the controversy could be eliminated.

Following the March 28 Commission meeting, the plaintiffs filed the instant action, and the City began eviction proceedings in state court. A hearing was held on the plaintiffs' motion for preliminary injunction, and that hearing has since been converted, upon the consent of the parties, into the full trial on the merits.

## II. FIRST AMENDMENT CLAIM

### A. Applicable Legal Standards

Although the Cuban Museum may not have a "right" to the renewal of its lease

with the City of Miami, that conclusion is not dispositive of this case. In *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), the Supreme Court held that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech." The *Perry* Court went on to hold that the lack of a contractual or tenure right to a renewed employment contract does not defeat a claim alleging that the denial of re-employment is a First Amendment violation. *Id.* Similarly, the lack of a contractual right to the renewal of a lease in the instant case does not defeat the plaintiffs' claims. Rather, the focus of the court's inquiry is whether the City of Miami denied the Cuban Museum continued possession of the building now housing the Museum on the basis of the plaintiffs' exercise of their First Amendment rights.

■ In *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court articulated the manner in which burdens are allocated in cases such as this. Initially, plaintiffs bear the burden of showing that their conduct was constitutionally protected and that the conduct was a substantial or motivating factor in the governmental decision to deny a benefit. *Id.* at 287, 97 S.Ct. at 576; *Berry v. Bailey,* 726 F.2d 670, 674 (11th Cir.1984), *cert. denied,* 471 U.S. 1101, 105 S.Ct. 2326, 85 L.Ed.2d 844 (1985). Defendants must then show by a preponderance of the evidence that the benefit would have been denied in the absence of the protected conduct or expression. *Id.; Berry,* 726 F.2d at 674.

### B. Analysis

1. Constitutional Protection

The Cuban Museum and the directors who have joined as plaintiffs in the instant action assert that the constitutionally protected conduct involved in this case was the decision to exhibit art "created by Cuban artists who were living in Cuba or who had not denounced Fidel Castro." Complaint, 6. The City argues, however, that the exhibition of these art works was not constitutionally protected conduct due to the Trading With the Enemy Act, specifically 50 U.S.C.App. § 5 and the regulations promulgated thereunder. The City argues that prior to the 1988 amendments to the Trading With the Enemy Act, *see* Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, § 2502(a)(1), 102 Stat. 1107, 1371 (codified at 50 U.S.C.App. § 5(b)(4)), and prior to Judge Ryskamp's opinion in *Cernuda v. Heavey,* 720 F.Supp. 1544 (S.D.Fla.1989), the plaintiffs' conduct was not constitutionally protected because the controversial paintings that were exhibited were no more than prohibited contraband.

■ The City's argument that the plaintiffs' conduct was not constitutionally protected fails for a number of reasons. First, the plaintiffs claim that the constitutionally protected conduct was the decision to exhibit, prior to auction, works created by Cubans living in Cuba or by Cubans who had not denounced Fidel Castro and his government. The decision made and the ideas conveyed by the Museum and its directors were that art should be exhibited and made available to the public regardless of the political beliefs and ideology of the artist. This decision and its expression are constitutionally protected. Moreover, the art made available as a result of such a decision does not necessarily include works that were ever within the purview of the Trading With the Enemy Act. There has been no evidence whatsoever, not even a scintilla, indicating that any of the controversial art work exhibited was prohibited by the Trading With the Enemy Act. Indeed, the evidence presented, that the controversy arose due to the exhibition of art work created by Cuban artists who were living in Cuba or who had not denounced Fidel Castro, leads to the factual conclusion that, at a minimum, a substantial amount of the controversy arose from art work that had no connection with Castro's Cuba other than a possible ideological connection based on the artists' personal political beliefs.

■ Assuming, however, that some of the controversial art work fell within the scope of the Trading With the Enemy Act at the time of the controversial auction and exhibition, the effect of the 1988 amendments to the Act become important in analyzing the constitutional protection afforded the plaintiffs at the time the decision was made to deny them the continued possession of the building and premises that house the Cuban Museum. Although some of the conduct of the Cuban Museum and its directors may arguably have been unprotected at the time of the auction, due to the nonspeech elements sought to be regulated by the Trading With the Enemy Act, First Amendment protection that may have been curtailed under the Act was restored with the passage of the amendments. *See Cernuda v. Heavey,* 720 F.Supp. 1544 (S.D. Fla.1989). Any possible intrusion on the full and free exercise of First Amendment rights was removed, thereby restoring full constitutional protection to any formerly prohibited conduct on a retroactive basis. Moreover, full constitutional protection was restored prior to the City's decision not to permit the plaintiffs to continue occupying and using the premises at 1300 S.W. 12th Avenue.

Based on the foregoing, this court concludes that the plaintiffs' exhibition of art "created by Cuban artists who were living in Cuba or who had not denounced Fidel Castro" is subject to the full protection of the First Amendment.

2. Basis for Denial of Continued Possession

■ Having found that the plaintiffs' actions are constitutionally protected expression, this court must next determine how the plaintiffs' exercise of their First Amendment rights affected the City's decision to deny them the continued use of the Museum building and premises.

Although various accusations have been leveled at the Cuban Museum, its board, and its administration, the controversy and public reaction to the exhibition and auction of controversial works has pervaded the events that led to the filing of this case.

Various individuals have made allegations before the City Commission and before the media in an apparent attempt to have the City consider every possible justification that might allow it to remove those running the Cuban Museum from the premises where the Museum is housed. Although the City Commission may well have tried to rid the City of the Cuban Museum's present administration by pursuing what would otherwise be valid landlord-tenant concerns, the City nonetheless appears to have fallen victim to the local community's intolerance for those who chose to provide a forum for controversial artists.

It seems clear from the evidence presented that members of the Miami City Commission were displeased, perhaps even offended, by the Cuban Museum's decision to exhibit art works created by Cubans who were still living in Cuba or who had not renounced Castro and his government. Even if personal feelings were properly set aside, the Commission was obviously influenced by the local community's outrage and public outcry over the events. Although the City Commission may have been well intentioned in taking steps to bring peace back to the community, thereby ending the controversy, the intolerant bickering among various groups, and the dissension within the local community, it could not attempt to accomplish such well intentioned goals by sacrificing those whose views and method of expression had caused others to respond with hostility and scorn. The plaintiffs' views and the manner in which they expressed them, conduct protected by the First Amendment, was clearly a substantial and motivating factor in the City's decision to bring an end to the Cuban Museum's continued possession of the premises located at 1300 S.W. 12th Avenue. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Berry v. Bailey,* 726 F.2d 670, 674 (11th Cir.1984), *cert. denied,* 471 U.S. 1101, 105 S.Ct. 2326, 85 L.Ed.2d 844 (1985).

The City argues that the plaintiffs' exercise of their First Amendment rights was not a substantial motivating factor behind the City Commission's decision. The City

also argues that the reasons it advances would have caused the City to reach the same decision, even in the absence of the controversial art and the resulting public unrest.

The City sets forth a number of reasons for its decision not to allow the Cuban Museum to continue its operations at the city-owned location. These reasons include: (1) allegations that directors of the Cuban Museum were making a profit in connection with the two auctions conducted through the Cuban Museum; (2) alleged concern over a $2.00 admission charge, the Museum's hours of operation, and the posting of signs; (3) alleged concern over holiday fundraising sales in December of 1988 and December of 1989; (4) the Museum's "seeming failure" to comply with insurance requirements; (5) alleged concern over the neighborhood in which the Museum was located; and (6) a City charter provision requiring a process of competitive bidding before city-owned property can be leased. This court nonetheless concludes that, in the absence of the plaintiffs' decision to exhibit the controversial works, the City would not have denied the Cuban Museum continued use and possession of the leased premises on the basis of any or all of the reasons advanced by the City. The conduct of the City Commission with respect to the asserted grounds for the denial of continued possession reveals that the reasons asserted were either minor concerns or a pretextual basis upon which to remove the Cuban Museum and its present directors. The reason behind the City's decision was the controversial and highly unpopular views that the plaintiffs had advanced. This is readily apparent from a review of the evidence presented in this case.

Almost immediately following the controversial exhibition and auction, the City began looking into virtually every allegation made against the Cuban Museum and its present directors. The City quickly ordered investigations of the auctions in order to detect a basis for eviction. Noting the City's concern over the auctions, the Cuban Museum cooperated with the investigations and never held another auction. After repeated investigation and research led to the conclusion that the holding of the auctions was not a basis for eviction, the City's focus turned towards allegations of self-dealing and towards allegations that directors may have profited from the auctions. Investigations revealed that all moneys were properly accounted for. No evidence was submitted that any actions were ever brought for breach of fiduciary duties. Various directors simply appear to have been assisting the Museum's fundraising efforts by submitting portions of their private collections for auction, risking unprofitable selling prices, and yet donating an established percentage of the final sales prices to the Museum. Certainly, the court has seen no evidence that any director benefitted at the expense of the Museum. More importantly, however, the court notes that the Commission never exhibited any real concern over possible self-dealing and auction profits in connection with directors other than those who had been linked with the controversial art.

The City advanced another similar reason for its actions, arguing that the holiday fundraising sales in December of 1988 and December of 1989 led the City to its decision to deny the Cuban Museum the continued use of city-owned property. The history of such sales, the presence of former mayor Maurice Ferre at similar functions during his tenure as mayor, the limited fundraising purposes of such sales, and even the invitations sent to members of the Commission to such events leads the court to conclude that the City did not act on the basis of these sales. Moreover, the City Attorney had pointed out that the factual history behind these sales strongly suggested no impropriety or lease violations that would serve as a basis for City action. Likewise, the Museum's "seeming failure" to comply with insurance requirements seems to have played no part in the City's decision. Testimony was introduced evidencing that the Museum had insurance coverage, the City Attorney had opined that the facts did not allow for City action due to a lack of insurance, and the City has simply argued that there was a "seeming" lack of insurance. The City never ap-

peared to have any real concern over this matter.

The other asserted grounds for the City's actions also prove unconvincing. While the City argues that it was concerned with $2.00 admissions charges, the Museum's hours of operation, and the posting of signs, the City does not appear to have made any significant inquiry into these matters, matters that could have been investigated without intrusion by simply sending a City employee to observe the Museum. Moreover, the City did not appear sufficiently concerned with these matters to even ask the Cuban Museum to change these practices. Certainly, there is no evidence that notice and an opportunity to cure were ever provided. This lack of real concern is also evident with respect to the City's asserted concern over the safety of the neighborhood in which the Cuban Museum is located. Although the City is always undoubtedly concerned over the safety of innocent members of the community, there is no evidence to suggest that there was any concern of impending danger despite two bombings at the Museum. Certainly, the evidence suggests that the City did not feel that the area required any substantial increase in police protection. Moreover, the petition signed by the neighbors of the Cuban Museum, including the principal of the neighboring parochial school, reveals that there was virtually no fear that the Museum was a danger to the neighborhood. Under these circumstances, this asserted justification for the City's action simply cannot pass muster.

Finally, the City argues that § 29–B of the City of Miami Charter would have required the City to deny the Cuban Museum the continued use and possession of the property at 1300 S.W. 12th Avenue. The City argues that the City Commission lacked the power to renew the lease with the Cuban Museum as a result of § 29–B. The City argues that the action taken by the City was essentially mandated by the City of Miami Charter regardless of the City's underlying motives. A competitive bidding process for the use of the property would have to take place.

While the § 29–B argument advanced by the City appears persuasive at first glance, the manner in which the City manages city-owned property reveals that the decision to oust the Cuban Museum from the premises at 1300 S.W. 12th Avenue was not a foregone conclusion. The City has regularly allowed others to use city-owned property without formal leases and without the use of the procedures in § 29–B. Notably, such continued use of city-owned property has occurred following the expiration of leases where those in possession were providing some sort of community service, not unlike the cultural community service offered by the Cuban Museum. Moreover, the City has never argued that it is not empowered to allow the Cuban Museum to continue using and occupying the premises at which it is currently located. The City's argument that § 29–B of the Charter required the City to reach the same decisions and to commence eviction proceedings in state court is therefore untrue. The assertion of the City Charter is no more than pretext.

In analyzing the reasons and motives behind the City's actions in this case, the court also places substantial weight on the City Commission's actions with respect to those who opposed the Cuban Museum and its directors. In this regard, the evidence presented clearly points out that the City Commission was interested in providing a location to another competing group whose views were more popular and reflective of the "true" political, cultural, and ideological spirit of the local Cuban community. The City Commission also exhibited great interest in providing this opposition group with the premises at 1300 S.W. 12th Avenue. It appears, however, that the City would indeed have allowed the Cuban Museum to remain on the city-owned property if some sort of reconciliation had occurred whereby the Cuban Museum and its directors could have "meshed" with the more popular group and come to reflect the principles for which they stood. Such a reconciliation would presumably have erased or ended the controversy that arose from the plaintiffs' exercise of their First Amendment rights and proved tantamount

to a retraction of the ideas that the plaintiffs had espoused. Under such a scenario, the City appeared willing to allow the continued possession and use of city-owned property, without concern for any of the reasons that it has advanced as grounds for its actions. Additionally, the proposed resignation by various directors of the Cuban Museum did not affect the City's actions, despite the fact that these directors were those most closely tied to the controversy and to some of the City's alleged concerns. As pointed out by those opposing the Cuban Museum and its administration, the controversy would still have remained as long as some of the remaining directors had ties to the controversy and to the board that had made the controversial decision.

For the reasons discussed above, the court finds that the City of Miami's actions were indeed motivated by the plaintiffs' exercise of their constitutional rights, and that the City would not have acted to deny the plaintiffs' continued use and possession of the premises but for the plaintiffs' controversial exercise of their First Amendment rights.

## III. REMEDY

Having decided that the City of Miami's actions are an improper exercise of governmental power, the court must next consider the remedy for the violation of the plaintiffs' First Amendment rights. Addressing this matter, the City argues that the plaintiffs are entitled to no more than nominal damages for the violation of their First Amendment rights. The plaintiffs argue that they are faced with an irreparable injury justifying injunctive relief.

In order to obtain an injunction, the plaintiffs must demonstrate that there will be continuing irreparable injury if the injunction does not issue and that there is no adequate remedy at law for the First Amendment violation that is occurring. *See Newman v. Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982) (citing *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959)), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1773,

76 L.Ed.2d 346 (1983). The City argues that there has been no showing of irreparable injury and that the plaintiffs' damages are essentially economic damages for which the plaintiffs can be compensated. This simply is not so.

█ The irreparable injury involved in this case is the direct penalization of the plaintiffs for the exercise of their First Amendment rights. Indeed, the Eleventh Circuit has stated that "the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury," as does the direct penalization of those rights. *Cate v. Oldham,* 707 F.2d 1176, 1188 (11th Cir.1983) (quoting *Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328 (5th Cir. Unit B 1981)); *see also Northeastern Florida Chapter of the Association of General Contractors v. Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990) (recognizing that an ongoing violation constitutes irreparable injury in the area of First Amendment jurisprudence). The City argues, however, that this case is different because there is no ongoing violation. Again, this simply is not true. For approximately three years, the City has held the proverbial sword of Damocles over the plaintiffs, repeatedly investigating the plaintiffs and threatening with eviction; it continues to do so to this very day with the eviction proceeding that has been commenced in state court. The City even attempted to serve process on the Cuban Museum as the hearing in this action was taking place. An ongoing injury is occurring as the City continues to take steps in order to penalize the plaintiffs for the exercise of their First Amendment rights, thereby chilling the plaintiffs' exercise of their First Amendment rights by creating a fear that they may suffer future penalties and denials of governmental benefits. This chilling effect was made evident when various directors found it necessary to offer their resignations from the Cuban Museum's board so that the views expressed by the Museum would satisfy the City and the City would allow the Museum to continue occupying the premises where it is located.

The City argues further that an injury is not irreparable unless it cannot be undone through monetary damages. *See Northeastern Florida Chapter*, 896 F.2d at 1285; *Cate*, 707 F.2d at 1189. However, the *Cate* court pointed out that where a state court action was serving to penalize the plaintiff's First Amendment rights "[n]either a monetary award nor prevailing on the merits of the state court action could recompense [the] ongoing injury." 707 F.2d at 1189. The *Northeastern* court similarly recognized that penalizing First Amendment rights involves the chilling of free speech which cannot be compensated by monetary damages and which prevents plaintiffs from being made whole. *See Northeastern Florida Chapter*, 896 F.2d at 1285.

The City maintains that an adequate remedy is available for any violation that has taken place. Yet, the City correctly points out that there has been no actual economic or compensable damage. The damage being suffered is that the plaintiffs' exercise of their First Amendment rights is being penalized with the resulting chilling effect on speech. Moreover, "damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages" in § 1983 cases. *Memphis Community School District v. Stachura*, 477 U.S. 299, 310, 106 S.Ct. 2537, 2545, 91 L.Ed.2d 249 (1986).

In this case, the City is acting to deny the plaintiffs the continued use of the city-owned property that has served as the forum in which the Cuban Museum has expressed its views for nearly a decade. This site has come to be uniquely associated with the Cuban Museum, so much so that groups opposing the Museum and its current administration are unwilling to settle for an alternative city-owned site for a competing museum. Yet, the City denies the plaintiffs the continued use of this property as a penalty for the exercise of First Amendment rights. Such governmental action and the resulting continuing effects must be enjoined.

## IV. CONCLUSION

This case has brought before this court a conflict involving the very substance of the safeguards that the First Amendment was meant to provide. The First Amendment seeks to protect freedom of expression, whether those expressing ideas are members of a popular majority or members of an unpopular minority. Moreover, the First Amendment must assure that government does not curtail valid expression because a majority, a plurality, or any segment of its constituency wishes to prohibit or penalize that expression. Indeed, the Supreme Court has stated that, "[i]f there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989).

It is ironic that the curtailment and punishment of expression in this case is the result of actions taken by those who claim to so loathe the governmental intolerance existing in a communist Cuba. This court fully recognizes the rights of those who were incensed by the Cuban Museum's action and who chose to speak their minds, informing the City and anyone else of their objection and opposition to the views expressed by the Cuban Museum and its directors. However, it is altogether a different matter when governmental action is expected to deny another's freedom of expression. Rather than foster peace and understanding, such conduct seeks the type of intolerant governmental behavior that the opponents of the Cuban Museum so rightly oppose in the first instance. It is truly unfortunate when citizens put government in a position where it must choose between the wishes of the majority and the expression of those who are in the minority. Nonetheless, First Amendment freedom of expression must prevail.

Accordingly, after hearing testimony and argument in this matter and carefully reviewing the evidence submitted, this court

ORDERS and ADJUDGES that the defendant is hereby enjoined from evicting

the plaintiffs and denying them the continued use and possession of the premises located at 1300 S.W. 12th Avenue on the basis of the exercise of their First Amendment rights. The court further

ORDERS and ADJUDGES that the plaintiffs' prayer for damages is hereby DENIED. Finally, the court

RESERVES jurisdiction to consider a motion for costs and fees in connection with the litigation of this case, provided that the plaintiffs file and fully brief any such motion in a timely manner.

DONE and ORDERED.