WILSON, Circuit Judge,
dissenting:
The First Amendment prevents the government from banning books from school libraries, except in limited circumstances not present here. I find no abuse of discretion by the district court, which determined that there is a substantial likelihood that Vamos a Cuba was banned from the Miami-Dade County school library shelves because of its viewpoint, rather than for legitimate pedagogical reasons. Therefore, I must respectfully dissent.
I. STANDING
I agree with the majority’s reasoning and conclusion that while the plaintiffs do not have standing to challenge the School Board’s order to remove the entire A Visit to series, they do have standing to challenge the order to remove copies of Vamos a Cuba.[1] I thus turn to the issues regarding that part of the preliminary injunction.
*1231 II. PRELIMINARY INJUNCTION
“A district court may grant preliminary injunctive relief if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injury may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.” Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir.2000) (en banc). The School Board argues that we should reverse the district court’s grant of a preliminary injunction because the plaintiffs failed to establish a substantial likelihood of success on the merits.
The majority demands more than the law requires in its review of the district court’s grant of a preliminary injunction. First, “[w]e review the ultimate decision of whether to grant a preliminary injunction [only] for abuse of discretion.... ” Owner-Operator Ind. Driver’s Ass’n, Inc. v. Landstar Sys., Inc., 541 F.3d 1278, 1293 (11th Cir.2008) (quoting Teper v. Miller, 82 F.3d 989, 993 (11th Cir.1996)). “The trial court has considerable discretion in determining whether the situation requires the issuance of ... a [preliminary] injunction and the fact that the appellate court reaches a contrary conclusion does not warrant a reversal.” 11A ChaRLes AlaN Weight, Aethue R. Miller, & Mary Kay Kane, Federal Praotioe AND Prooedure: Civil 2d § 2962 (West 2008). Our review is highly deferential to the district court. Siegel, 234 F.3d at 1178; BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC, 425 F.3d 964, 968 (11th Cir.2005) (‘We begin our review by noting how deferential it is.”). “The review of a district court’s decision to grant or deny a preliminary injunction is extremely narrow in scope.” Carillon Imps. v. Frank Pesce Int’l Group, 112 F.3d 1125, 1126 (11th Cir.1997). See also Bevette v. Int’l Ass’n of Bridge, 740 F.2d 892, 893 (11th Cir.1984) (“Appellate review of such a decision is very narrow.”). “This Court will not review the intrinsic merits of the case.” Id. (quoting United States v. Lambert, 695 F.2d 536, 539 (11th Cir.1983) (internal quotation marks omitted)).
This limited review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district court.
Siegel, 234 F.3d at 1178 (quoting Gray Line Motor Tours, Inc. v. City of New Orleans, 498 F.2d 293, 296 (5th Cir.1974)).
The expedited nature of preliminary injunction proceedings often creates not only limits on the evidence available but also pressure to make difficult judgments without the luxury of abundant time for reflection. Those judgments, about the viability of a plaintiffs claims and the balancing of equities and the public interest, are the district court’s to make and we will not set them aside unless the district court has abused its discretion in making them.
BellSouth, 425 F.3d at 968 (quoting Cumulus Media Inc. v. Clear Channel Commc’ns, Inc., 304 F.3d 1167, 1171 (11th Cir.2002)). “[T]he trial judge’s ability to formulate a decree tailored to deal with the violations existent in each case is normally superior to that of any reviewing court, due to his familiarity with the testimony and exhibits.” AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1547 (11th Cir.1986). “The abuse-of-discretion standard, *1232 therefore, serves an important and vital purpose.” Siegel, 234 F.3d at 1178.
An abuse of discretion occurs if a district court fails to apply the proper legal standard or to follow proper procedures in making the determination, or makes findings of fact that are clearly erroneous. We review “findings of fact ... for clear error,” SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1198 (11th Cir.1999). We review “constitutional facts” de novo. Here, the School Board’s motive in removing Vamos a Cuba is a constitutional fact. See United States v. Hanna, 293 F.3d 1080, 1088 (9th Cir.2002); [Majority Opinion at 1202-07]. Thus, I review the district court’s finding of the School Board’s motive in making the removal decision de novo, but we must show higher deference to the district court’s other findings of fact. The majority claims it reviews only the School Board’s motive de novo, but it in fact includes many other fact findings that require greater deference in its de novo review.
While the majority is entitled to review the district court’s finding of the School Board’s motive as if the district court had made no such finding, that cannot be said for other facts the district court found with which the majority disagrees. For example, the district court found that many of the proffered inaccuracies were of little consequence and that many of the omissions were appropriate to omit given the age level and purpose of the book. ACLU of Fla., Inc. v. Miami-Dade County Sch. Bd., 439 F.Supp.2d 1242, 1288 n. 42 (S.D.Fla.2006) [hereinafter ACLU]. The majority disagrees, finding that the book “contains substantial factual errors” and that the presentation of that information is “damaging” to its readers. [Majority Opinion at 1215.] While the majority may disagree with the district court about what testimony and evidence was more credible a,nd persuasive, this is not the majority’s place. “[D]ue to his familiarity with the testimony and exhibits,” the trial judge was in a superior position to make determinations about the seriousness of the inaccuracies and omissions. See AmBrit, 812 F.2d at 1547. While the majority may find “the ‘like you’ representation [to be] inaccurate,” [Majority Opinion at 1217], the district court found that it was not an inaccurate factual statement, but was merely a device to emphasize the things that we have in common with Cuban people. ACLU, 439 F.Supp.2d at 1288. The district court was well within its discretion to rely on what it deemed to be the greater weight of the more persuasive and credible evidence presented at the preliminary injunction hearing. The majority disagrees with the district court’s finding that the book is “content-neutral and scrupulously apolitical.” Id. at 1283. It instead opines that “the ‘like you do’ statement makes the totalitarian regime that runs the country and controls the lives of everyone in it appear much better than telling the truth would.” [Majority Opinion at 1224.] It was not clearly erroneous for the district court to rely on the scores of professional educators that agreed that the book was “content-neutral and scrupulously apolitical.” The majority oversteps the applicable standard of review and engages in de novo review with regard to many factual findings.
Second, the majority treats this case as if it were a decision on the merits. It is not. This is an appeal from a preliminary injunction, for which there need only be a substantial likelihood of success on the merits, not a substantial certainty of success, as the majority seems to require. “The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, ... may grant a stay even though its own approach may be contrary to movant’s view of the merits.” Ruiz v. Estelle, 650 F.2d 555, 565 *1233 (5th Cir.1981)[2] (quoting Wash. Metro. Area Transit Comm’n v. Holiday Tours, Inc., 559 F.2d 841, 848 (D.C.Cir.1977)). In other words, “[a] district court’s determination that such a showing has been made is best understood as a prediction of a probable, but necessarily uncertain, outcome.” Smyth v. Rivero, 282 F.3d 268, 276 (4th Cir.2002). See also Am. Fed’n of Gov’t Employees, Local 1858 v. Callaway, 398 F.Supp. 176, 196 (N.D.Ala.1975) (“Th[e] [likelihood of success on the merits] requirement does not mean that a plaintiff must establish during a preliminary hearing held only a few days after the institution of suit, without the benefit of discovery, that no doubt exists as to the ultimate resolution of the merits.”). “All courts agree that [a] plaintiff must present a pri-ma facie case but need not show that he is certain to win.” 11A ChaRles Alan WRIGHT, ARTHUR R. MlLLER, & MARY KaY Kane, Federal Practice and Procedure: Civil 2d § 2948.3 (West 2008).
“The fact that a preliminary injunction is granted in a given circumstance, then, by no means represents a determination that the claim in question will or ought to succeed ultimately; that determination is to be made upon the ‘deliberate investigation’ that follows the granting of the preliminary injunction.” Smyth, 282 F.3d at 276. See also Unicon Mgmt. Corp. v. Koppers Co., 366 F.2d 199, 205 (2d Cir.1966) (noting that a trial court need not find that the party seeking a preliminary judgment ultimately would prevail on the merits in order to issue a preliminary injunction). Here, the majority ignores certain evidence in order to reach its decision. Instead of considering all the evidence in the record, as the district court did, the majority ignores various statements made by School Board members which suggest and sometimes even admit impermissible motives in the removal decision. Since this was not a trial on the merits but was instead a preliminary injunction hearing, the credible and persuasive evidence was sufficient for the district court to have found a substantial likelihood of success on the merits.
Although I agree with the majority that the plaintiffs have failed to establish a substantial likelihood of success on their due process claims, I disagree with its conclusion on the First Amendment claim. I find no abuse of discretion by the district court, which conducted a searching and thorough analysis of the evidence, deciding the case solely on law and precedent.

A. The First Amendment Claim

We are without much precedent to help us decide the extent to which the First Amendment applies to school library book removal decisions. But the precedent we do have does not, in my view, support the majority’s conclusion.
I agree with the majority that Justice Brennan’s plurality decision in Pico is of limited precedential value, in the absence of a majority opinion joined by four other justices. I also agree that the First Amendment does not forbid a school board from removing from its shelves books that contain gross factual inaccuracies. Nor do I disagree with the proposition that a school board may remove a book because it is educationally unsuitable. I part company with the majority on its conclusion that the Miami-Dade County School Board’s actual motive for ordering Vamos A Cuba from the shelves of its library was because of “gross factual inaccuracies” or “inaccuracies by omission.”[3]
*1234 Although school boards are vested with wide discretion to decide what books occupy its library shelves, I do not believe that the First Amendment permits a school board to ban a book for the purpose of suppressing the viewpoints expressed in the book, when the educational content of the book is otherwise innocuous. Vamos a Cuba, which is simply a part of an apolitical, superficial geography series, is only 26-sentences in length. I attach, in its entirety, the text as an Appendix. Having read the book and independently examined the entire record, I agree with the district court that the School Board’s claim that Vamos a Cuba is grossly inaccurate is simply a pretense for viewpoint suppression, rather than the genuine reason for its removal. The record supports the district court’s determination that the book was not removed for a legitimate pedagogical reason.
The majority declines to determine whether the standard set forth in Hazelwood School District v. Kuhlmeier, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), or the standard set forth in Board of Education v. Pico, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), applies to school library book removal decisions, finding that “even if the plaintiffs ... got the [standard] of their dreams,” the test articulated by a plurality of the Supreme Court Pico, the plaintiffs would still lose because the School Board removed Vamos a Cuba for “legitimate pedagogical reasons.” [Majority Opinion at 1202.] I also do not determine which standard applies, as I find that even under the more lenient standard the Court set forth in Hazelwood, the plaintiffs demonstrated a substantial likelihood of success on the merits.
Under the more lenient standard in Ha-zelwood, a school board may regulate expression related to curricular materials so long as the school board’s motivation is “reasonably related to legitimate pedagogical concerns.” Hazelwood, 484 U.S. 260, 273, 108 S.Ct. 562, 571, 98 L.Ed.2d 592 (1988). This standard does not, however, permit a school board to engage in viewpoint discrimination. Searcey v. Harris, 888 F.2d 1314, 1319 n. 7 (11th Cir.1989). “The prohibition against viewpoint discrimination is firmly embedded in [First Amendment] analysis.” Id. at 1325 (citation omitted). Therefore, we have held that “we will continue to require school officials to make decisions relating to speech which are viewpoint neutral.” Id. (citing Virgil v. Sch. Bd. of Columbia County, 862 F.2d 1517, 1522-23 & n. 6 (11th Cir.1989)). We must decide whether a political motive was the motivating or decisive factor in a school board’s decision to remove a book. Pico, 457 U.S. at 872, 102 S.Ct. at 2810. This record demonstrates that, even under the Hazelwood standard, the School Board engaged in viewpoint discrimination, and that this viewpoint discrimination was the decisive factor in its motivation when it removed Vamos a Cuba from its libraries. The greater weight of the credible evidence supports the district court’s finding “that the majority of the Miami-Dade County *1235 School Board members intended by their removal of the books to deny schoolchildren access to ideas or points-of-view with which the school officials disagreed, and that this intent was the decisive factor in their removal decision.” ACLU, 439 F.Supp.2d at 1283.
State-supported censorship of speech based on political viewpoint offends the First Amendment. “If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion_” W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). This bedrock of the First Amendment applies with special force to the protection of children, a principle recognized by the district court when it concluded in its order:
[I]t is the primary function of our schools to prepare their students for citizenship. Students will practice this “citizenship” in a country which prizes diversity and dissent. Hence, our schools must embody intellectual openness, lest they teach youth to discount important principles of our government as mere platitudes. The First Amendment ensures wide exposure to that robust exchange of ideas upon which the Nation’s future depends. The School Board may not use its inherent power to expunge the expression of disfavored ideas.
ACLU, 439 F.Supp.2d at 1288. The district court’s analysis here is faithful to Supreme Court guidance: “[t]he Nation’s future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection.” Keyishian v. Bd. of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683,17 L.Ed.2d 629 (1967) (alterations and quotations omitted). In Justice Brennan’s words:
[T]he right to receive ideas is a necessary predicate to the recipient’s meaningful exercise of his own rights of speech, press, and political freedom.... [J]ust as access to ideas makes it possible for citizens generally to exercise their rights of free speech and press in a meaningful manner, such access prepares students for active and effective participation in the pluralistic, often contentious society in which they will soon be adult members.
Pico, 457 U.S. at 867-68, 102 S.Ct. at 2808-09 (emphasis omitted). Here, the School Board’s own Collection Development policy recognizes these principles, encouraging the acquisition of “[mjaterials on controversial issues representing various views in order that young citizens may develop, under guidance, the practice of critical analysis and intellectual integrity in forming judgments.” [PI Exhibit 43.]
There is perhaps no more important place for guarding free speech principles than in our Nation’s schools. Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 512, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969) (“The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.”) (quoting Keyishian, 385 U.S. at 603, 87 S.Ct. at 684). It is axiomatic that public school students do not “shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.” Id. at 506, 89 S.Ct. at 736. “That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of government as mere platitudes.” Barnette, 319 U.S. at 637, 63 S.Ct. at 1185. “In our system, students may not *1236 be regarded as closed-circuit recipients of only that which the State chooses to communicate.” Id. at 511, 89 S.Ct. at 739. “[T]he First Amendment ... does not tolerate laws that cast a pall of orthodoxy over the classroom.” Keyishian, 385 U.S. at 603, 87 S.Ct. at 683. “Hence, our schools must embody intellectual openness, lest they teach youth to discount important principles of our government” as trivial. ACLU, 439 F.Supp.2d at 1288.
If the school is one of the most important laboratories for application of free speech principles, then its library is perhaps the most important. See Pico, 457 U.S. at 868, 102 S.Ct. at 2809 (“[T]he special characteristics of the school library make that environment especially appropriate for the recognition of the First Amendment rights of students.”) (emphasis omitted). Nowhere can a student better expose herself to the multitude of ideas so vital to nurturing the participation of young people in a pluralistic society. Thus, “students must always remain free to inquire, to study and to evaluate, [and] to gain new maturity and understanding” in the school library. Keyishian, 385 U.S. at 603, 87 S.Ct. at 684 (quoting Sweezy v. New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957)). It is “a mighty resource in the free marketplace of ideas.” Minarcini v. Strongsville City Sch. Dist., 541 F.2d 577, 582 (6th Cir.1976). The school library, “no less than any other public library, is ‘a place dedicated to quiet, to knowledge, and to beauty.’ ” Pico, 457 U.S. at 868, 102 S.Ct. at 2809 (quoting Brown v. Louisiana, 383 U.S. 131, 142, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966)). “In [a] school library a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum. The student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom.” Id. at 869, 102 S.Ct. at 2809 (alterations, citations, and quotations omitted).
Because the school library occupies a unique place in the educational system as a place for voluntary study, school boards “must discharge their important, delicate, and highly discretionary functions within the limits and constraints of the First Amendment.” Id. at 865, 102 S.Ct. at 2807 (quotations omitted). Students’ First Amendment rights may be “directly and sharply implicated by the removal of books from the shelves of a school library.” Id. at 866, 102 S.Ct. at 2808.
While school boards are accorded wide discretion in the management of school affairs, that discretion is not unlimited. They have “important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights.” Barnette, 319 U.S. at 637, 63 S.Ct. at 1185. A school board may remove a book from a school library for legitimate pedagogical reasons, such as obscenity or factual inaccuracy. But if a school board’s motive for removal is suppression of a viewpoint expressed in the book, its removal decision is unconstitutional. Searcey, 888 F.2d at 1319 n. 7; Virgil, 862 F.2d at 1522-23 & n. 6. Here, the School Board claims that it removed Vamos a Cuba because of factual inaccuracies and omissions, rendering the book educationally unsuitable. The plaintiffs dispute the School Board’s actual motive for removing the book, claiming the School Board was motivated to suppress the content-neutral and apolitical viewpoint about Cuba expressed in the book.
The majority reverses the district court and concludes that the School Board removed Vamos a Cuba because of factual inaccuracies that paint Cuba under the Castro regime in a falsely positive light. It finds that the district court’s reasoning is flawed because “[the district court] nev *1237 er comes to grips with the substance of the School Board’s position, which is that representations made in Vamos a Cuba falsely portray a life in Cuba that does not exist and that in reality life under the Castro regime is bad — really bad.” [Majority Opinion at 1221.]
I read the district court’s order differently. The district court concluded that the School Board’s stated reasons for removing the book were merely a pretext for the political views prevalent in Miami that oppose the Castro regime. This conclusion is altogether separate from any determination about quality of life in Cuba. In fact, the district court acknowledged the dire situation in Cuba. E.g. ACLU, 439 F.Supp.2d at 1265 (noting that “the Cuba Books omit the harsh truth about totalitarian life in Communist Cuba”). It empathized with the Cuban American community. Id. at 1284 (noting the painful experiences Cuban Americans endured “under an oppressive totalitarian regime”). But recognizing that life in Cuba is oppressive does not justify constitutionally impermissible viewpoint discrimination. The greater weight of the record evidence supports the district court’s finding that the School Board acted in a narrowly partisan, political manner in furtherance of ideological viewpoints, in a way that the First Amendment forbids, when it voted to remove Vamos a Cuba from its library shelves.
The School Board claimed it removed Vamos a Cuba because of factual inaccuracies and omissions, which render the book educationally unsuitable. For example, it claimed that the book’s statement that “people in Cuba eat, play and go to school like you,” [Vamos a Cuba: 5 (emphasis added)], is an inaccurate portrayal of life in contemporary Cuba. The district court, however, found that the evidence of viewpoint discrimination was “overwhelming.” ACLU, 439 F.Supp.2d at 1282. It found that the “greater weight of the more persuasive and credible evidence at the preliminary injunction hearing [demonstrated] that the majority of the Miami-Dade County School Board members intended by their removal of the books to deny school children access to ideas or points-of-view with which the school officials disagreed and that this intent was the decisive factor in their removal decision. In so acting, the School Board abused its discretion in a manner that violated the transcendent imperatives of the First Amendment.” Id. at 1283.
The district court further concluded that although “the debate [at the School Board meetings] was couched in terms of ‘inaccuracies’ contained in the Cuba books, the real issue was that the Cuba books were content neutral and scrupulously apolitical, and did not reflect, as viewed by the majority of the School Board numbers, the true evil of Castro’s government and the oppression of the Cuba people.” Id. According to the district court, “the gist of the argument, however, is that the books were too objective and, therefore, should be banned.” Id.

1. Statements in Connection with the Removal Decision

The Eleventh Circuit “ha[s] not hesitated to look beyond the stated reasons for school board action.” Virgil, 862 F.2d at 1522 n. 6. While the majority finds that “the School Board majority[ ] [made] consistent statements that it was removing Vamos a Cuba from the school library shelves because of factual inaccuracies,” [Majority Opinion at 1227], I find little factual support for this conclusion in the record. Instead, I find numerous statements that demonstrate that other motivations were at work.
The record is rather clear that from the beginning of the removal process, the primary motivation for removing Vamos *1238 a Cuba was the favoring of one particular political viewpoint over another. A parent’s complaint launched the review process. The parent, Juan Amador, complained that “[a]s a former political prisoner from Cuba, I find the material to be untruthful” because “[i]t portrays a life in Cuba that does not exist.” [R:19:296] (emphasis added). Amador’s objection was that the book was not based on his perspective, that of the Cuban exile. “The merit or truth of [his perspective] is not the issue.... Tragically, that point-of-view is based on real life experiences that members of the Cuban Community and their families have painfully endured in Cuba before coming to this country, and which many who have remained continue to endure under an oppressive totalitarian regime.” ACLU, 439 F.Supp.2d at 1284. The issue instead is the state’s imposition of what shall be the orthodox view of Cuba — the First Amendment does not permit that one perspective officially dominate the discourse.
The record provides palpable support for the district court’s conclusion that School Board members banned the book not because of inaccuracies per se but because the book failed to make a negative political statement about contemporary Cuba. For example, School Board member Frank J. Bolanos described certain passages of the book as “distortions” and, after each “distortion,” he added his own comments on the subject matter, which he labeled as “reality.” Each “reality” demonstrates ideological opposition to the Castro regime. For example, Mr. Bolanos called the passage, “The people of Cuba eat, work and study like you,” [Vamos a Cuba: 5], a “distortion.” His corresponding “reality” was:
Nothing could be further from the truth. The people of Cuba survive without civil liberties and due process under the law and receive 10 to 20 year prison sentences for simply writing a document or voicing an opinion contrary to the party line. People are told where to work. They lose their job if they do not follow the dictates of the communist party. Children are indoctrinated and forced to chant Castro’s greatness in class.
ACLU, 439 F.Supp.2d at 1251. He also labeled the passage, “White rice is the most common food in Cuba. Black beans are eaten. Arroz con Polio is another favorite dish,” [Vamos a Cuba: 12], a “distortion.” His corresponding “reality” was: “Food is rationed; people stand in line for hours to ask for their measly ration only to be told they ran out. Children stop receiving their milk ration at age six.” ACLU, 439 F.Supp.2d at 1251. He called the passage, “The major celebration in Cuba is ‘Carnival.’ It is celebrated on July 26th,” [Vamos a Cuba: 26], a “distortion.” His corresponding “reality” was:
The annual commemoration of July 26th is the symbolic observation of the rise to power of Castro’s communist, totalitarian regime. It is a day of mourning for most Cubans. Cubans celebrate the 20th of May and the 28th of January, to celebrate their independence from Spain and the birth of Jose Marti, Cuba’s greatest national hero.
ACLU, 439 F.Supp.2d at 1251. Lastly, he labeled the passage, “The celebrations in Cuba are a mix of African and Catholic roots,” [Vamos a Cuba: 27], a “distortion.” Mr. Bolanos’ stated that in reality:
Historically, Castro’s regime has prohibited or chastised those that engage in religious practices, including the Catholic Church and other organized forms of religion. Religious leaders, including Jehovah’s Witnesses have been imprisoned. A famous cry while facing Castro’s firing squad was “Viva Cristo el Rey” (long live Christ the King).
*1239 ACLU, 439 F.Supp.2d at 1251-52. Mr. Bolanos argued that the book was rife with distortion because it omitted negative political information about the Castro regime, including omissions regarding political subjects such as civil liberties, due process, freedom of speech, government indoctrination, food rationing, and religious freedom. While Mr. Bolanos’ viewpoints may be correct, I find no support in the law for the state requiring a book to carry a political viewpoint.
The majority questions my discussion of Mr. Bolanos’ remarks. [Majority Opinion at 1215 n. 13.] My analysis should not be understood as questioning the truth or accuracy of his remarks. Indeed, life in Cuba is as bad as Mr. Bolanos makes it out to be. I analyze Mr. Bolanos’ “distortions” and “realities” to point out that his statements are concerned with the exclusion and inclusion of political statements from a particular viewpoint. The majority also faults me for putting the words “distortion” and “reality” in quotation marks, finding that this punctuation somehow means that I do not believe the truth of the statements. The majority mistakes my meaning. I use the quotation marks to designate that these were Mr. Bolanos’ statements, statements which, contrary to the majority’s contention, evidence that the School Board did not consistently state that it was removing the book because of inaccuracies. I am attempting to determine whether the School Board’s proffered reason for removing the book was pretex-tual, and nothing more.
Mr. Bolanos described the book as “hurtful and insulting to both our Cuban-American community and those Cubans still living on the island under oppressive conditions.” ACLU, 439 F.Supp.2d at 1251. He criticized the School Board’s book review process as one that would not “satisfy the segment of our community that is outraged, that feels discriminated against by this book.” [April Transcript, 73:3-73:11.] Some exiles want the discourse to reflect their plight, and they are “outraged” because the book does not conform to this message.
Several School Board members referred to their Cuban birth and their experience as exiles as explanations for why they found the book offensive. For example, School Board member Logan asserted that she wanted the book removed “as somebody who suffered [in Cuba] firsthand.” [April Transcript, 69:20-69:22.] School Board member Hantman prefaced her opinion by saying: “I am a Cuban American. I was born in Cuba. And as the other board members said, my family, and my father and mother lost everything they had worked for.” [April Transcript, 80:13-80:22.] She later stated, “I suffered and my family suffered with the rise of Fidel Castro.” [June Transcript, 22:17-18.]
School Board member Perez also demonstrated her motivation for objecting to the book when she remarked that the book “is especially damaging to the sensibilities of this community.” [April Transcript, 62:7-62:9.] The sensibilities to which she referred are those sensibilities that are hostile to the Cuban government and are intolerant of contrary, less hostile, views. She compared Vamos a Cuba to books about “pornography ..., devil worship and other offensive things like that.” [April Transcript, 60:9-60:12.]
School Board member Barrera acknowledged the accuracy of the picture on the cover of Vamos a Cuba showing children in their school uniforms — “to the average person it is just kids in school uniforms.” [June Transcript, 11:10-11:11.] But, he continued, “as a Cuban, and to the Cuban American community, ... that [picture] represents what is there today, which is the dictatorship of Fidel Castro. So, yes, we are offended. Even though it doesn’t say anything, but the cover of that book is *1240 offensive to us as a community.” [June Transcript, 11:11-18.] Mr. Barrera objected because the book merely displayed the picture and neglected to comment negatively on the school uniforms and their symbolic connection with Castro.
Mr. Barrera was also bothered by the portrayal of Cuba as normal — “just kids in school uniforms.” [June Transcript, 11:10-11:11.] “To present Cuba as a normal place is unacceptable to exiles because it negates the very reason for their exile and struggle. The adamant rejection of normalcy accounts for the strong desire to remove from the library shelves a book that treats Cuba as the same as any other country.” ACLU, 439 F.Supp.2d at 1284 n. 37 (quoting [R:19:281J). Similarly, District Materials Review Committee (DMRC) members Balcells and Dr. Usate-gui explained that the books “present a portrayal of life in Cuba for young children as being normal, benign, and politics-free-with a focus of trying to draw human parallels showing that life is relatively the same as in other countries.” [R:19:457J Their criticism is grounded in a portrayal of Cuba as normal and apolitical.
The majority responds that to say the evidence reflects improper motive “confuses interest with motive.” [Majority Opinion at 1224.] It argues that Cuban Americans are more interested than others in removing false books about Cuba, and that they are “offended” only by the “inaccurate portrayal of life in Cuba.” [Majority Opinion at 1224.] The distinction between motive and interest has little merit in this context. The various comments made by School Board members, as I discussed above, reflect that it was not only inaccuracies that offended them. To the contrary, the cover of the book, which Mr. Barrera admitted was accurate, was offensive because of the Cuban school uniform’s symbolic connection with that which he abhors.[4] The record supports the conclusion that the School Board was not merely interested in removing a book full of inaccuracies; it was motivated to remove a book that symbolically represented something with which it disagreed.
Some members of the Cuban American community attended the School Board meetings and demonstrated their intolerance to messages that fail to conform to their personal experiences. One member of the DMRC, Ronald Bilbao, described the environment at one of the meetings, as “very scary.” [Supplemental Bilbao Declaration at p. 3.] He noted that “it was packed with people from the community who kept interrupting. Security guards were standing by. I felt intimidated and I was afraid to speak freely at the meeting.” [Id] When a DMRC member said something about the book being accurate, some would whisper “communist” and hiss. [Id] For example, when the DMRC discussed the passage regarding the Carnival celebration at page 26 of the book, which says, “Cuba’s biggest celebration is called Carnival. It is held on July 26. People dance and sing at this festival,” a member, Mr. Rivera, said that this was inaccurate because “[the book] doesn’t also say that people who live there are required to go to the festival.” [Id] Mr. Bilbao replied “that as far as [he] could tell the book is *1241 accurate, it just doesn’t add that people have to attend.” [Id.] In response to this comment, Mr. Rivera got angry with Mr. Bilbao and members of the community hissed at Mr. Bilbao and called him a communist. [M] He spoke only that one time at the meeting because he felt intimidated. [Id.] Members of the audience at the meeting “kept pressuring [Mr. Bilbao]” and telling him “that the book was offensive and hurtful to the Cuban community.” [Id.]
The Superintendent of the Miami-Dade County School System also noted the intense political pressure from the community:
I have listened carefully to the citizens who have come to address the School Board ... and have been struck by some disturbing signals of intolerance, which left unaddressed could threaten the progress and the harmony that has marked our community over the last decade. Divisive rhetoric only damages the fabric of our society. However, respectful, open and frank discussions about our differences and cultures lead to understanding and build bridges of acceptance. There can be no doubt that the issues raised at recent Board meetings must be dealt with in ways that reflect respect for different opinions and sensitivity to views held by both the majority and the minority.... There is no “easy fix” to the complex issues we are contemplating; we can teach children that even the most twisted knots can be untied by citizens willing to work together for solutions that recognize many legitimate interests and concerns.
Memorandum from Superintendent of Schools Crew to Deputy Superintendent Dunbar, May 22, 2006, [R:19:35-26.]
The intensity of the feelings in the Cuban American community in Miami was not lost upon the district court:
Nothing written here is intended to cast doubt upon the heartfelt point-of-view expressed by Mr. Bolanos and his supporters. Tragically, that point-of-view is based on real life experiences that members of the Cuban Community and their families have painfully endured in Cuba before coming to this country, and which many who have remained have continued to endure under an oppressive totalitarian regime.
ACLU, 439 F.Supp.2d at 1284. But a sensitivity to the horrors of the Castro regime does not permit state-sponsored censorship of other viewpoints, as the district court noted:
[M]any have come to this nation, and continue to do so today, for the opportunity to live in freedom under the protection of our Constitution and Bill of Rights. The quintessential freedom of speech may not be sacrificed on the altar of beliefs no matter how firmly those beliefs are held. In this nation, we do not prohibit the expression of an idea simply because some in the community find it offensive or disagreeable.

Id.

There was prior precedent supporting the district court’s decision to grant the motion for preliminary injunction. A Miami museum had held an auction of art created by artists who had not renounced the Castro regime or continued to live in communist Cuba. Cuban Museum of Arts and Culture, Inc. v. City of Miami, 766 F.Supp. 1121, 1122 (S.D.Fla.1991). Outraged by the museum’s tolerant attitude toward contemporary Cuba, the auction was held amidst hostility and threats in the Miami community. Id. One of the paintings was purchased and burned in the streets as a crowd chanted its opposition to the artists. Id. A bomb exploded under the automobile of a director of the museum. Id. Members of the museum’s exec *1242 utive committee were pressured to resign, and those that did not “endured McCarthy-like allegations of communist inclinations and sympathies.” Id. Eventually, following years of controversy, a Miami city commission decided not to renew the museum’s lease. Id. at 1124. The museum brought an action to enjoin the city, claiming the controversial art was subject to First Amendment protection. Id. A district court enjoined the city from evicting the museum, holding that the controversial art was subject to First Amendment protection and the city’s asserted grounds for evicting the museum were either minor concerns or a pretextual basis upon which to remove the museum. Id. at 1129. The court found that the city commission “appear[ed] to have fallen victim to the local community’s intolerance for those who chose to” exhibit artwork by artists who expressed a contrary political viewpoint to the Castro regime. Id. at 1126.
Similarly, here the School Board, a politically elected body, was faced with intense community pressure. A member of the Miami community confirmed at a School Board meeting: “There is a narrow group of Cuban Americans, a small group, a small sector, very powerful, politically strong that imposes their will on the Cuban community and everybody else in Dade County to fear, to threat, to intimidation.” [R:19:310:14-310:19.] School Board member Robert Ingram illustrated the inordinate pressure the School Board was under to remove the book when he said that if the members of the School Board did not vote to remove the book, “they can’t walk out of here. If they don’t vote for it, they can’t go home, they might find a bomb under their automobiles.... ” [R:19:430:16-18.] As in Cuban Museum, of Arts and Culture, “[e]ven if [the School Board members’] personal feelings were properly set aside, [the School Board] was obviously influenced by the local community’s outrage and public outcry over” a book that failed to reflect politically orthodox views toward Cuba. 766 F.Supp. at 1126. The evidence also shows that personal feelings were not always put aside; indeed, School Board member Hantman explained that her decision to ban the book was grounded “firmly in [her] commitment to stand with the Cuban American community, [of] which [she is] a very proud member.” [June Transcript, 21:17-19.] She further stated that she “would not be doing her job as a Cuban American” if she did not vote to remove the book. [June Transcript, 24:21-23.]
The record contains observations by educators, most of whom were themselves employed by the School Board, who consistently assured the Board that whatever omissions and inaccuracies there were in the book were not significant enough to remove the book for a legitimate pedagogical reason. One School Board member explicitly admitted this: “The 22 professional educators who reviewed this book have affirmatively determined that [the book does not have serious, material, irrevocable and clear inaccuracies and biases], therefore, we are here today in essentially a political process.” [June Transcript, 34:23-35:2.] Furthermore, “[t]he record should reflect that this issue has been driven by Phone-A-Thons, phone banking, radio, newspaper articles, e-mail campaigns, letter writing campaigns.... We are rejecting the professional recommendation of our staff based on political imperatives that have been pressed upon members of this board.” [June Transcript at 35:5-35:15.] Certainly a School Board is a political body that must serve its constituents. However, the School Board also took an oath to uphold the Constitution. No amount of political pressure can trump the First Amendment of the Constitution.

*1243
2. Circumstances Surrounding the School Board Debate

We are required to give some weight to “the circumstances surrounding the School Board’s vote to remove the [b]ook [which] cannot help but raise questions regarding the constitutional validity of its decision.” Campbell v. St. Tammany Parish Sch. Bd., 64 F.3d 184, 191 (5th Cir.1995). First, the School Board failed to consider, much less follow, the recommendations of two previous committees of professional educators and lay people retained to help guide the review process, whom the School Board’s attorney admitted conducted “extensive analysis and deliberations.” [R:19:116.] The committees consistently found that Vamos a Cuba was educationally suitable, noting that it was “scrupulously apolitical,” “factually accurate, and developmentally appropriate.” [E.g. Ad Hoc School Materials Review Committee Evaluation of Instructional Materials.] The School Board’s failure to consider the advice of professional educators or librarians, or even the Superintendent, reinforces the suspicion that the School Board’s motivation was constitutionally impermissible. See Campbell, 64 F.3d at 190-91 (noting that “failpng] to consider, much less adopt, the recommendation of two previous committees to restrict the Book’s accessibility ... in apparent disregard of its own outlined procedures — has the appearance of [improper] motivations”); Pico, 457 U.S. at 874-75, 102 S.Ct. at 2811-12 (finding that ignoring the advice of literary experts, librarians, teachers, and the Superintendent, may support suspicions that a school board’s motivations were unconstitutional).
Second, one School Board member attempted to have the Board violate the Board’s own rules and circumvent the appeals process set out by School Board rule, proposing that the School Board immediately remove Vamos a Cuba without waiting for the administrative process to proceed. The Board eventually voted 6 to 3 to allow the administrative process to run its course, but only after the School Board’s attorney advised the School Board to remain “mindful of its own board rule and follow all levels of due process procedures in our book removal process.” [April Transcript, 56:19-56:24.] Further, counsel reminded the School Board that the School Board rules did not allow the School Board to “act independently and remove a book that it finds objectionable. Rather, it must follow the process that is in that rule in order to achieve that purpose.” [April Transcript, 58:16-58:22.]
Third, the School Board eventually did violate its own procedures when it voted to remove the entire A Visit to series of which the book is a part. None of the other 19 books in the geography series were ever reviewed for accuracy by a review committee or the Superintendent per the School Board’s rules, nor were they previously questioned on appeal. Most of the School Board members had not even read the rest of the series before they voted. The School Board’s reluctance to follow its own procedures in connection with the series as a whole raises more questions about its School Board’s motivations. Id. at 190-91 (noting that “apparent disregard of [a school board’s] outlined procedures ... has the appearance of ‘the antithesis of those procedures that might tend to allay suspicions regarding the [s]chool [b]oard’s motivations’ ”) (quoting Pico, 457 U.S. at 875, 102 S.Ct. at 2812 (alterations omitted)); Case v. Unified Sch. Dist. No. 233, 908 F.Supp. 864, 875 (D.Kan.1995), aff'd in part and rev’d in part on other grounds, 157 F.3d 1243 (10th Cir.1998) (finding that the “irregular and erratic manner in which [the school board] removed [a book] from the District’s libraries and their disregard of established policy and procedure are important evidence of their improper motivation”). The *1244 fact that the School Board removed books that many of its members had never even read further suggests that the School Board majority may have had impermissible motives for removing the book from the library shelf. Campbell, 64 F.3d at 191 (finding “questionable] ... the constitutional validity of [the school board’s] decision” when many school board members had not read the book in question or had not read its entirety).
The content and circumstances of the debate cast doubt on the School Board’s proffered motivation that it removed the book because of factual inaccuracies.

3. The School Board’s Proffered Inaccuracies and Omissions

The majority finds that “[a] fact of great significance in deciding whether the School Board was motivated to remove Vamos a Cuba because of inaccuracies is that the book indisputably does contain inaccuracies.” [Majority Opinion at 1211.] The majority says that it is undisputed “that the book ... contain[s] inaccuracies” and that “[i]f there had been no factual inaccuracies, the book would not have been removed.” [Majority Opinion at 1227.] My independent view of the record, however, fully supports the district court’s determination that these inaccuracies were merely post hoc rationalizations for the book’s removal — “plausible but disingenuous justifications.” ACLU, 489 F.Supp.2d at 1282.
The majority faults the district court for going through this very exercise, stating that “[t]he district court’s decision about educational suitability is ... wrong for the ... fundamental reason that it was not a matter for the district court to decide, [as] [s]uch questions are the perfect example of a core educational policy matter within the exclusive province of local school boards.” [Majority Opinion at 1225.] But the district court’s purpose in examining the educational suitability of the books was to get to the heart of the actual motivation on the part of the School Board, which the Supreme Court requires. See Pico, 457 U.S. at 870, 102 S.Ct. at 2810 (holding that while school boards “rightly possess significant discretion to determine the content of them school libraries ... that discretion may not be exercised in a narrowly partisan or political manner”); see id. at 907, 102 S.Ct. at 2828-29 (Rehnquist, J., joined by Burger, C.J. and Powell, J., dissenting) (“cheerfully conceding] [that school boards] may not exercise[] [their discretion] in a narrowly partisan or political manner”); Zykan, 631 F.2d at 1306 (“[N]othing in the Constitution permits the courts to interfere with local educational discretion until local authorities begin to substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make pedagogic choices regarding matters of legitimate dispute.”) (emphasis added). Federal courts must engage in some analysis of the educational suitability of a book if this is the suggested basis of a school board’s decision. Here, the Miami-Dade School Board found “that the book was inaccurate and contains several omissions.” [R:19:172.]
In order for a court to determine if the proffered reason for removal was pretextual, it must evaluate those findings. A court must evaluate whether the proffered motivations have such weaknesses, implausibilities, or incoherencies such that they are unworthy of credence. Contrary to the majority’s suggestion, we do not overstep our bounds by evaluating educational suitability for this limited purpose. See Virgil, 862 F.2d at 1517 n. 6 (“Courts have not hesitated to look beyond the stated reasons for school board action.”). Only the School Board has the authority to determine whether a book’s content makes it suitable for the school library shelves. But after carefully reviewing the evidence, *1245 the district court concluded that the School Board removed the book not because of its factual inaccuracies, but because a majority of the School Board agreed with the members of the community who considered an apolitical picture of Cuba to be offensive. Cf. Pratt v. Ind. Sch. Dist. No. 831, 670 F.2d 771, 778 (8th Cir.1982) (holding that a school board could not constitutionally ban films from the school curriculum because a majority of the school board objected to the ideological and religious content of the films). I do not “decide” the educational suitability question, as the majority contends that I do. [See Majority Opinion at 1226.] Instead, I scrutinize the School Board’s proffered omissions and inaccuracies to see whether there are such weaknesses, implausibilities, and inco-herencies in the record to support the district court’s determination regarding the genuine motivations for the removal decision.

a. The School Board’s Proffered Omissions

The vast majority of educators that reviewed the book found that the omissions on which the School Board eventually relied to remove it did not affect its educational suitability. In fact, the omissions about which the plaintiff complained, if included, were found to be developmentally inappropriate and would render the book educationally unsuitable. [R:19:267^ 17.] (finding that the type of information the objectors found was omitted from the book “would be detrimental to a child’s understanding of the world at a very young age”). As the district court found, the School Board’s concerns with Vamos a Cuba seem to be “based on an adult attempting to import an adult value system into a children’s book.” ACLU, 439 F.Supp.2d at 1287. The book was written for children ages four to eight.
The School Board complained that various facts relating to the Cuban government were omitted from the book. One of the School Board’s experts, Dr. Juan Clark, listed the book’s omissions of facts, which included the regime’s rationing of consumer goods, limitations on private enterprise, the agricultural system, government-control and indoctrination of the education system, and child labor. [R: 19:47-48.] The plaintiffs’ experts Lucia Gonzalez and Patricia Scales considered the inclusion of such information in children’s books. Ms. Gonzalez found that children in this age group cannot grasp “the level of political thought implicit in” these omitted facts. [R:19:267^ 17.] Ms. Scales noted that they do not understand the concept of “government” in any sophisticated way. [R:19:255^ 16.] Rather, educators introduce young children to concepts including “community or culture, ... self, and how they fit in, and their understanding of these concepts is only the most basic at this age level.” [R:19:255J 16.] The record supports the conclusion that these omissions would have been inappropriate to include in light of the conceptual understanding of children in this age group.[5]
The book attempts to illustrate complicated subjects in simple ways. For exam- *1246 pie, an in-depth discussion of Cuba’s complicated transportation systems is omitted from the book. However, the book does explain the transportation situation. As the School Board’s expert Dr. Clark asserted, Cubans cannot buy new cars, public transportation is overcrowded, and foreigners do not take buses. But nothing the book says paints a different picture— the book reads: “[T]here are not many cars ... [and] most Cubans travel by bus.” [Vamos a Cuba: 18.] As such, Dr. Clark’s omission is not so much an omission as a developmentally appropriate way of presenting information to children in the early grades of elementary school.
Similarly, the technical information about houses and buildings that Dr. Clark noted was omitted “would be giving [children] more information than they would need, want or could comprehend,” according to Ms. Scales. [R:19:255^ 18.] Dr. Clark objected that the book only notes that there are new and old buildings without noting that some buildings are deteriorated. [R:19:47.] But such factual detail would be lost on a reader in this age group. [R:19:256^ 18.] “Children are far less patient than adults and will not wade through factual and technical details.” [R:19:256^ 18.] Children need to know only the concise fact that there are new and old buildings, as Vamos a Cuba points out at page 10. [R:19:256:t 18.]
It could well be that Vamos a Cuba’s simple depiction of life in Cuba does not contain information that would lead to a child’s better understanding of it. According to the testimony of several of the plaintiffs experts, however, it is better to err on the side of caution in a young children’s book. Giving too much inappropriate information, like the information regarding government discussed above, “is cognitively more damaging to young children than [giving] too little.” ACLU, 439 F.Supp.2d at 1287. The School Board’s expert, Dr. Usategui, disagreed, stating that the book teaches “something different from what the children learn in their homes or from peers in their neighborhoods,” which “can lead to cognitive dissonance.” [R:27:128^ 11.] Dr. Usate-gui argued in essence that the public school library shelves should not contain books which cast a pall on what is politically orthodox in the community. But the Supreme Court stated inW. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943): “If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.... ”
Furthermore, if included, the negative information about Cuba the School Board claimed was omitted could render the book developmentally inappropriate for children. The majority, in order to demonstrate the differences between Cuba and the United States, highlights negative information including “domestic violence, underage prostitution, sex tourism, [and] discrimination against persons of African descent.” [Majority Opinion at 1214 (quoting the Cuba Human Rights Report)]. According to Ms. Scales, however, an “important aspect of books written for young children is that they emphasize the positive.” [R:19:256^ 20.] Negative subjects are inappropriate. Assuming it could even be understood by young children, negative information “has the danger of frightening children or inducing a sense of hopelessness that is both unnecessary and developmentally inappropriate.” [R:19:256^ 20.]
The majority points out that two other books in the series include negative information, while Vamos a Cuba makes Cuba out to be “hunky dory.” [Majority Opinion at 1227.] First, the negative information *1247 to which the majority refers is minor. The Cambodia and India books briefly touch on the war in Cambodia and poverty in India in one sentence each, while leaving out volumes of negative information that their respective Human Rights Reports include. That left out information would likewise render the Cambodia and India books developmentally inappropriate. Moreover, Vamos a Cuba does not depict Cuba as “hunky dory” by any means. The pictures depict Cuba as a poor country, with children missing articles of clothing (on page 10 a young boy is shirtless and on page 19 a boy is shirtless and shoeless), people engaged in manual labor, children also engaged in such labor, and outdated housing and cars. Some of the text verifies this— for example, at page 23, it reads: “Some children work in gardens. Older children may work in factories.” Negative information is in fact included in Vamos a Cuba. More extreme negative information is left out, along with any negative political information.
The omitted information also falls outside the scope of a superficial geography book.[6] Vamos a Cuba is simply part of an apolitical geography series. Its overall purpose is “to offer very basic information to young children about the way of life in another country.” [R:19:267^ 15.] The very title of the book tells the reader that he “will be taken on a brief visit through the pages of the book.” [R:19:256^ 21.] If a young child were traveling, he would likely be taken to only certain places and would see only limited things. He would be shown a windmill in Holland, not the “Red Light” district in Amsterdam. [R:19:256J 21.] He would be shown the Eiffel Tower, not the seedy sections of Paris. [R:19:256-57:f 21.] Vamos a Cuba introduces information children would want as young readers, and not beyond. “[Vamos a Cuba], like all the other books in the series, is simply meant to give small children a sense of what it’s like to be a child in another country. One page in [Vamos a Cuba] shows a shirtless and shoeless little boy leading a team of oxen to a farm field. Should the text say it’s a state-owned collective? I don’t think so, although a knowledgeable parent could tell his child that. Assuming a 6-year-old would care.” Michael Putney, Let’s Close the Book on Attempts to Censor, Miami Hekald, April 19, 2006, [Plaintiffs Exhibit 20.]
A mother and teacher noted at a School Board meeting: “introduc[ing] the truth to *1248 children [is best done] in increments.” [April Transcript, 20:10-12.] A simple glimpse into life in Cuba stimulates the young child’s interest so he will seek more complex information when he is older. [R:19:253 — M 13.] Moreover, a parent may provide more information to satisfy his child’s curiosities, just as the parent may show his child more than a windmill or the Eiffel Tower. Vamos a Cuba provides only a basic picture of Cuba and contains a section at the end of the book called “More Books to Read.” [Vamos a Cuba: 32.] That section refers a curious reader to additional sources, including a more in-depth book with a recommendation that “an older reader can help you with this book.” [Vamos a Cuba: 32.] Consequently, the young reader can build on the basic information he has just learned by seeking out more information about Cuba. “Not every book can be everything to every child,” [Scales Cross, 115:8-9], which Vamos a Cuba implicitly recognizes by referring readers to further material.
The answer to books that do not provide all the information a reader wants is to find another book. If a reader is curious about the Castro regime, he can find another book that enlightens him further. Nothing in this book hinders that process. To the contrary, it provides a simple glimpse into Cuba which will form the basis of a future, deeper understanding about the country. [April Transcript, 25:10-13] (“a child may not be ready to understand all of the horrors of the Castro regime, but this book can be used to start the discussion about true life in Cuba”). Even Mr. Amador, the father who made the underlying challenge to the book conceded: “The best thing that’s happened here is that this has given me further opportunity to talk with my child, my daughter, about the reasons why we are here, and even though they may not understand still what I’ve been through and what so many of Cubans have been through, I hope some day they will understand .... ” [June Transcript, 7:7-13.] Despite his purpose, Mr. Amador illustrated the marketplace of ideas.

b. The School Board’s Proffered Inaccuracies

Many of the inaccuracies complained of are inconsequential, which casts doubt on whether those proffered motivations for the book’s removal are worthy of credence. For example, one of the “inaccuracies” is that the book explained that Cuban music is played with maracas made of pumpkins. [Vamos a Cuba: 28.] Dr. Clark objected: “To say that maracas are made of pumpkins shows the utter ignorance of the writer on this matter. The maracas are made from the güiro fruit, dried and properly processed.”[7] [R:19:217J Yet, according to the Dictionary of the Royal Spanish Academy, the güiro fruit in fact is a pumpkin. It is a type of gourd, which are in the same family as pumpkins. While it may have been more precise for the book to say that maracas are made from a güiro fruit or a gourd, it borders on frivolity to argue about whether a maraca is made from a pumpkin. [R:19:277:f 7.] Moreover, it is evident that explaining that a maraca is made from a güiro fruit will mean far less to an American four-year-old than explaining that it is made from a pumpkin, with which Halloween has rendered the four-year-old familiar. [R:19:277^ 7.]
The inaccuracy that Dr. Clark considers to be “probably the worst factual error in the book,” [R:19:48], is at page 29: “In a Cuban valley, there are big colored paintings, on the rocks and caves. These were painted by Cuba’s inhabitants about a *1249 thousand years ago.” [Vamos a Cuba: 29.] The book includes a picture of a rock painting was done in the 1960s, not 1,000 years ago. [R:19:48]. While some Cuban caves do indeed have prehistoric paintings, the one pictured in the book is not one of them. [R:19:278.] While this is misleading, it does not justify removing the book.
Another error listed by Dr. Clark is that Cuban houses are not made from palm trunks, as the book noted on page 11, but instead from the upper growth of the palm. [R: 19:47.] This seems inconsequential, as a young reader will understand that the houses are made from the palm in any case.
In response to the School Board’s complaints about generalizations in the book about traditional customs and dress, Ms. Seales stated, “all similar non-fiction books about other countries for young children contain generalizations about traditional dress and customs. For example, a book about Scotland for children of this age would almost invariably highlight men wearing kilts when the reality is that these garments are rarely worn and are very tourist-oriented.” [R:19:256-J 19.] Such generalizations do not render a book inaccurate so much as they simplistieally illustrate Cuba’s culture.
The book’s sentence which has perhaps generated the most controversy is it’s first sentence: “People in Cuba eat, work, and go to school like you do.” [Vamos a Cuba: 5.] It appears fairly evident that this short sentence is meant to show simply that other children in other cultures also do those things. 0&:19:255:¶ 17.]
The record supports the book’s evident purpose, which “is to paint a very elementary picture of Cuban life and culture in a way that fosters cross-cultural understanding among young children.” 0&:19:278:¶ 8.] Explaining cross-cultural commonalities is “appropriate for the level of understanding for children in this age group.” [R:19:255^ 17.] The book conveys the message that although Cuba may seem very different, when it comes to the essentials, all children are the same in that they also “eat, work, and go to school.” It is important to note that Vamos a Cuba subsequently states, after the “like you do” comment, that “[l]ife in Cuba is also unique.” [Vamos a Cuba: 5.] First the book stresses the common ground, then it goes onto explain the differences.
Without some common ground it is difficult for a child to learn about what would otherwise seem too foreign. It would be inappropriate for a book that teaches children elementary notions of Cuban culture and society to present it the way the objectors would like: a place where, as the majority says, life is “bad — really bad,” [Majority Opinion at 1221], Instead, “[t]he emphasis [is] on things people share in common, not what divides and drives them apart.” ACLU, 439 F.Supp.2d at 1288.
23. A Dangerous Precedent
The majority concludes that the book is “inaccurate because of what it does not say,” in that it leaves out the horrors of the Castro regime. [Majority Opinion at 1211.] Opening the door to the majority’s interpretation of “inaccuracy” would lead to a host of challenges. [June Transcript, 34:4-34:11 (School Board member Greer pointing out that if the School Board adopts this standard then “next week we will have another complaint about another book from another group, and if this standard is applied, we will go through almost every book in our system with legitimate objections that people can raise about the omissions from their point of view of the content of those materials”).] For example, a reference book for children about cars and trucks would be “inaccurate” without information about how their emissions contribute to global warming. Brief for American Booksellers Foundation for *1250 Free Expression et al. as Amici Curiae Supporting Appellees at 18, ACLU v. Miami-Dade County School Board, No. 06-14633 (11th Cir. Nov. 22, 2006). The sanctioned banning of a simple book like this would be logically supported by a finding that age-appropriate, politically neutral texts are rendered “inaccurate” by their omission of information that would express a particular political viewpoint.
I am also troubled by the majority’s discussion about how the “book was not being banned ... [but rather] removed from a school’s library shelves.” [Majority Opinion at 1217.] The majority argues that because the book was removed from a school’s library shelves, but could still be found in other public libraries in the area and was available for purchase, the booked was not banned. I disagree.
At the outset, I note that our argument here is largely semantical- — what the majority calls “removal” I call banning. No matter what we call it, I would still find that the record supports that the School Board’s removal/banning violated the First Amendment.
Nevertheless, the majority’s definition of banning does not comport with the dictionary definition. According to Webster’s New Twentieth Century Dictionary, “ban” means simply “to prohibit” or “to forbid.” Webstek’s New Twentieth CentüRY Dictio-naey 144-45 (1976). According to Black’s Law Dictionary, it means “to prohibit, especially by legal means.” Blaox’s Law DictionaRY 139 (7th ed.1999). This is precisely what the Miami-Dade School Board did when it passed a resolution to prohibit, by legal means, public school libraries from carrying Vamos a Cuba.[8] The School Board prohibited even the voluntary consideration of the book in schools. This book was not a part of the curriculum or required reading — it was a library book. The dictionary does not require, as the majority does, that one must be prohibited from having a book altogether for that book to be banned.[9]
Moreover, the majority’s definition of the word does not comport with the common usage of the word. Indeed, it does not comport with our own Circuit’s usage of the word. See Virgil v. Sch. Bd. of Columbia County, 862 F.2d 1517, 1525 (11th Cir.1989) (suggesting that a book is “banned” if it is not available in a school library).[10] See also Scott v. Sch. Bd. of Alachua County, 324 F.3d 1246, 1247-49 *1251 (11th Cir.2003) (per curiam) (calling school administrators’ prohibition of the display of Confederate flags on school grounds “banning,” even though the prohibition does not apply elsewhere); Denno ex rel. Denno v. Sch. Bd. of Volusia County, 218 F.3d 1267, 1277-78 (11th Cir.2000) (calling a prohibition of Confederate flags on school grounds, and not elsewhere, a “ban”). Similarly, other courts define the word “ban” the way that I have. See, e.g., B.W.A. v. Farmington R-7 Sch. Dist., No. 07-3099, at *4, *8, 2009 WL 211934, 554 F.3d 734, 736-37 (8th Cir. filed Jan. 30, 2009) (calling a school board’s prohibition against depicting the Confederate flag on clothing in schools “banning”); Barr v. Lafon, 538 F.3d 554, 557-77 (6th Cir.2008) (calling the prohibition against wearing clothing displaying the Confederate flag “banning,” even though the students were not prohibited from wearing that clothing outside of school); Sypniewski v. Warren Hills Reg’l Bd. of Educ., 307 F.3d 243, 248-63 (3d Cir.2002) (calling the prohibition against wearing or possessing items depicting racial hatred a “ban,” even though those items were not prohibited outside of the schools); Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1028 (9th Cir.1998) (referring to the removal of books in schools as “banning”); Pratt v. Ind. Sch. Dist. No. 831, 670 F.2d 771, 773-80 (8th Cir.1982) (referring to the “banning” of a film in schools based on their ideological content); Cary v. Bd. of Educ., 598 F.2d 535, 536 (10th Cir.1979) (calling books “banned” when they were removed from use in classes); Sund v. City of Wichita Falls, 121 F.Supp.2d 530, 533 (N.D.Tex.2000) (referring to the removal of books in libraries as “banning”); Borger v. Bisciglia, 888 F.Supp. 97, 98, 100 (E.D.Wis.1995) (referring to a film removed from the curriculum as “banned”); Sheck v. Baileyville Sch. Committee, 530 F.Supp. 679, 681-83 (D.Maine 1982) (referring to a book as “banned” when it was removed from a school library). Moreover, in other contexts, we use the word “ban” as I use it here. See, e.g., Searcey v. Harris, 888 F.2d 1314, 1318, 1322 (11th Cir.1989) (calling a school board’s regulation prohibiting certain groups from presenting at career day “banning,” even though they were not prohibited from presenting elsewhere). For example, we say that smoking has been “banned” on airplanes and in restaurants, even though people are free to have cigarettes and smoke in other venues. See, e.g., Fla. Stat. ÁNN. § 386.206 (2008) (referring to “the smoking ban” in workplaces when people are allowed to have cigarettes and smoke in other venues); Roark & Hardee LP v. City of Austin, 522 F.3d 533, 550 (5th Cir.2008) (referring to “smoking bans” even though smoking is permitted in some areas). In sum, our usage of the word “ban” does not require that people be forbidden from having the object entirely, as the majority contends.[11]
*1252 Furthermore, under the majority’s definition — “where a government or its officials forbid or prohibit others from having a book,” [Majority Opinion at 1218], a school board could never ban a book. It has the authority to remove books only within its school system. If it does this, according to the majority, it has not banned the book, as it could only be “banned” if people cannot have the book altogether. Can it be that a school board can never take any action that would constitute banning? Can it be that “[i]f a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, [or] if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration,” Pico, 457 U.S. at 870-71, 102 S.Ct. at 2810, this would not constitute banning because the schoolchildren are not also forbidden from owning these books at all? Such a definition limits the word’s application to almost nothing.
Furthermore, it does not somehow lessen the School Board’s “important, delicate, and highly discretionary functions” if the book remains available in other venues. The majority suggests that a school board’s removal action is less repugnant to the First Amendment when it discusses all the ways one can still get his hands on a copy of the book, including online vendors, like Amazon.com. However, the requirements of the First Amendment are “[not] minimized by the availability of the disputed book in sources outside the school.” Minarcini v. Strongsville City Sch. Dist., 541 F.2d 577, 582 (6th Cir.1976). See also Denver Area Educ. Telecoms. Consortium v. FCC, 518 U.S. 727, 809, 116 S.Ct. 2374, 2418, 135 L.Ed.2d 888 (1996) (Kennedy, J., concurring in part and dissenting in part) (“[T]he possibility the Government could have imposed more draconian limitations on speech never has justified a lesser abridgment.... [F]ew of our First Amendment cases involve outright bans on speech.”). “Restraint on protected speech generally cannot be justified by the fact that there may be other times, places or circumstances for such expression. The symbolic effect of removing the [book] ... is more significant than the resulting limitation of access to the story.” Pratt v. Ind. Sch. Dist. No. 831, 670 F.2d 771, 779 (8th Cir.1982) (citations omitted). As in Pratt, the Miami-Dade County School Board “has used its official power to perform an act clearly indicating that the ideas contained in the [book] are unacceptable and should not be discussed or considered. This message is not lost on students and teachers, and its chilling effect is obvious.” Id. The majority’s discussion of what constitutes “banning” chips away at the important limitations the First Amendment imposes on state-supported censorship of speech.
CONCLUSION
For decades, residents of Communist Cuba have emigrated to the United States to escape the repressive totalitarian regime of its dictator, to seek freedom, and to enjoy the privileges of United States citizenship. Prominent among those privileges is the freedom of speech, protected by the First Amendment to the United *1253 States Constitution. The banning of children’s books from a public school library under circumstances such as these offends the First Amendment. As one Cuban American lamented, “I fear we may have become what we protest against — a totalitarian government.” Matthew I. Pinzur, Book on Cuba To Stay, For Noto, Miami Herald, April 19, 2006, [Plaintiffs Exhibit 20],
“Don’t like the book? Don’t check it out. That’s a choice unavailable to people in Cuba.” Michael Putney, Let’s Close the Book on Attempts to Censor, Miami Herald, April 19, 2006, [Plaintiffs Exhibit 20.]
I respectfully dissent.
APPENDIX
(1) Cuba — “Cuba is a country in the Caribbean Sea, south of Florida. It is one big island with some smaller ones nearby. People in Cuba eat, work, and go to school like you do. Life in Cuba is also unique.” (2) Land — -“Cuba has flat plains that are used for farmland. There are also sandy beaches and coral reefs. The weather in Cuba is very warm. There are mountains in Cuba, too. The mountains are covered with forests.” (3) Landmarks — “The capital of Cuba is Havana. The Capitol building in Havana looks like the United States Capitol building in Washington, D.C. Morro Castle is an old fort. It was built by people from Spain. It was used 400 years ago to protect Havana from pirates.” (4) Homes — -“Most Cubans live in cities. The cities are crowded, so many live in apartment buildings. There are some beautiful old buildings. There are new buildings, too. Most homes in the country are simple. Some are made of wood from palm trees. They have roofs of palm leaves or grasses.” (5) Food — “White rice is the most common food in Cuba. Sometimes it is mixed with black beans. Chicken with rice is popular, too. Many kinds of fruits grow in Cuba. Bananas, pineap-pies, oranges, and mangoes are favorites. Yucca is a plant that people eat as a vegetable.” (6) Clothes — “Cubans dress to keep cool in the hot weather. Many children wear shorts and T-shirts. For special festivals, men wear white pants and white shirts. Women wear colorful ruffled dresses.” (7) Work — “Some Cubans work in factories that make cigars or sugar. There are also factories where people make cloth, shoes, paper, and farm tools. In the country, there are large farms. The workers there grow sugarcane and tobacco. There are also farms for vegetables, such as lettuce, onions, and carrots.” (8) Transportation — “There are not many cars in Cuba. In the cities, some people drive old cars from the United States. Most Cubans travel by bus. On country roads, people use animals to pull wagons. Animals are also used to help farmers in their fields.” (9) Language — “Most people in Cuba speak Spanish. This is because Cuba was settled by people from Spain. Spanish uses some of the same letters as English. There are also some extra letters in the Spanish alphabet.” (10) School — “Cuban children go to school between the ages of five and fourteen. They wear uniforms to school. There are different colored uniforms for different ages. In school, children learn math, reading, and history. All school children do some kind of work during their school day. Some children work in gardens. Older children may work in factories.” (11) Free Time — “Baseball is Cuba’s national sport. Cuba won the gold medal in baseball in the 1996 Olympic Games. Cuba’s beaches are good for swimming and boating. People like to dive and fish. There are also rowboats and sailboat races.” (12) Celebrations — “Cuba’s biggest celebration is called Carnival. It is held on July 26. People dance and sing at this festival. Some people who settled in Cuba were Roman Catholics. Other people who lived in Cuba *1254 were from Africa. So some Cuban celebrations mix African and Catholic beliefs.” (13) The Arts — “Cuban music mixes sounds from Africa and Spain. Musicians use guitars, drums, and gourds to make music and a beat. Dances from Cuba are popular around the world. In one valley in Cuba, there are large colorful paintings on some rocks. Inside the rocks are caves. The caves have paintings made by people who lived in Cuba about 1,000 years ago.”

. I refer to all copies of the English A Visit to Cuba and its Spanish-language counterpart, ¡Vamos a Cuba!, by the title Vamos a Cuba, as the majority does.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

. The majority twists my meaning in its opinion, implying that I somehow believe "that the Constitution obligates a government entity to place falsehoods, whether gross or ungross, on the shelves of school libraries.” [Majority *1234 Opinion at 1222 n. 17.] I do not. Plainly, school boards may remove books from library shelves which contain falsehoods. However, they may not when their primary motivation for removing the books is viewpoint discrimination, and the books’ falsehoods are a pretext for that genuine motivation. My dispute with the majority is not about "what the Constitution obligates" but instead what the evidence shows motivated the School Board to make its removal decision. Moreover, the majority makes much of my use of the word “gross” in front of "inaccuracies." I do this only because this is why the School Board claimed it was motivated — that it removed Vamos a Cuba because it was filled with "gross inaccuracies.”

. The majority opinion points out that just as the Cuban schoolchildren in uniforms offended a School Board member, "[t]he Hitler Youth wore uniforms, too, and that uniform was symbolically connected to that which many people abhor about the Third Reich.” [Majority Opinion at 1223 n. 18.] I do not doubt this. However, I would not censor a book which depicted a picture of Hitler Youth, either. The First Amendment forbids the state from prescribing political orthodoxy, no matter how abhorrent the alternative message. The majority opinion seems to add inflammatory rhetoric about Hitler where it has little relevance.

. The majority suggests that these subjects may be able to be presented in an age-appropriate manner, though it recognizes that the experts disagree on this point. [Majority Opinion at 1216.] But even the School Board’s expert, Dr. Usategui, admitted that such subjects “are difficult concepts for this age group.” [Id. (quoting [R:2T: 129:¶ 12.])] Dr. Usategui admitted that such difficult subjects, like “hardships of other children,” could be taught through only limited means, such as "participating in activities that help underprivileged children, such as toy drives.” [Id. (quoting [R:27:129:t 12.])] Dr. Usategui never suggested that such difficult information could be properly presented in a book, but only through other means.

. The majority makes much of my calling Vamos a Cuba a "geography” book. [Majority Opinion at 1211 n. 9.] The district court also found that Vamos a Cuba was a "geography” book. ACLU, 439 F.Supp.2d at 1287 (calling Vamos a Cuba "part of a series of geography books written for 4-6 year old children”). This factual finding by the district court is reviewed under a clearly erroneous standard. This would seem to be another instance wherein the majority engages in de novo review of an historical fact when it should have given greater deference to the district court. Additionally, the School Board admits that Vamos a Cuba is “geography” book. Id. at. 1294 (quoting Defendants’ Response to Plaintiffs’ Supplemental Memorandum on Certain Preliminary Injunction Elements at 9) (referring to the series as "geography books”). Last, according to Webster’s New Twentieth Century Dictionary, "geography” includes the study of the "inhabitants ... and industries of the” region. Webster’s New Twentieth Century Dictionary 765 (1976). The majority seems to have a narrower conception of the study of geography than the dictionary has. In order to show that Vamos a Cuba is not in fact a geography book, it states that geography books are not about "whether [people in a country] face hardships.” [Majority Opinion at 1211 n. 9.] I agree. This is precisely my point — the School Board removed the book from the shelves because it did not contain information that it was never meant to contain, as it was well beyond the scope of a simple geography book.

. Only the Spanish version of the book says that maracas are made of pumpkins. The English version correctly says that the maracas are made of gourds.

. The majority states that I "ignore[ ] the fact that the Board, and the Board alone, has the responsibility and authority under Florida law to decide what books are to be on the shelves of school libraries in its district,” such that, under my understanding of the word, "when an entity decides to remove a book from its own library shelves it has banned itself from having that book.” [Majority Opinion at 1218-19. The majority suggests that such an outcome is somehow absurd. I disagree. When a school board decides to remove a book from the school libraries within its district, it indeed has banned itself from having that book on its library shelves. If a school principal were to place Vamos a Cuba on the shelves of a Miami-Dade County school library, the School Board would order it removed. This amounts to what the majority deems so absurd: "bann[ing] itself from having that book.”

. I am unconvinced by the majority’s assertion that if removing a book from the library shelves in an act of banning, "deciding not to purchase a book [must also be] an act of banning it, [which] no rational person would suggest....” [Majority Opinion at 1218.] As previously discussed, the dictionary defines banning as prohibiting, especially by legal means. By not stocking a book on a library shelf in the first place, a school board has prohibited no one from subsequently placing that book on a shelf. On the other hand, the School Board's action here prohibits all the district's schools from placing Vamos a Cuba on their library shelves.

. The majority states that Virgil uses the word “ban” "only [when relying on] the opinion of a district court in Maine.” [Majority Opinion at 1219.] This is untrue. Virgil uses *1251 the word "ban” several times throughout the opinion, in various contexts, including to explain that the books at issue in the case were not “banned” from a school because they were available in the school library. See Virgil, 862 F.2d at 1525 (noting "that the disputed materials have not been banned from the school. The [disputed materials] are available in the school library.”). While this may not be "the basis of the [Virgil] decision,” it illustrates the court's consistent use of the word and its meaning.

. The majority rightly points out that the Supreme Court did not use the word “ban” to describe book removal in the Pico decision. [Majority Opinion at 1220-21.] However, because I speak to the common usage of the word, both by the courts and in everyday use, the majority's point does not detract from the importance of the many other courts’ use of the word and the way we all commonly use it. If we must look to the Supreme Court for guidance, we need not look any further than the Tinker decision. There, a school prohibited its students from wearing black armbands *1252 as a political protest. Tinker, 393 U.S. at 504, 89 S.Ct. at 735. The Court called the prohibition a "ban.” Id. at 508, 509, 89 S.Ct. at 737, 738, 89 S.Ct. 733. Even though the school did not prohibit the wearing of such armbands outside of the school, and indeed could not have done so, the Court nonetheless referred to the action as a "ban.” Thus, the Supreme Court’s use of the word does not comport with the majority’s conception of a "ban” as when a "government or its officials forbid[s] or prohibits] others from having an [object]” altogether. [Majority Opinion at 1218.]